53 A.3d 385

**Lincoln MILLER**

v.

**STATE of Maryland.**

**No. 1907, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Sept. 26, 2012.

Flynn M. Owens (Rubin & Owens, PA, Baltimore, MD), on the brief, for appellant.

Mary Ann Ince (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: MEREDITH, WRIGHT and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), J.

### Journeys in the Fourth Dimension

The key issue before us, as we reconsider on remand our earlier decision in this case, is that of how a recent opinion of

the Supreme Court announcing constitutional law might retro-actively apply to a Maryland conviction that had long since become final and is now before us only on collateral, rather than on direct, review. Our focus will be upon 1) the test that must be applied to determine whether the recent Supreme Court pronouncement is or is not "new law"; 2) the precise earlier Maryland event to which the newly announced federal law is arguably to be retroactively applied; and 3) the time as of which the "old versus new law" measurement is to be taken. Permeating all of these issues is the critical question of timing. When does something that once was "new law" become "old law" and, if it does thus ripen, what exactly are the maturing agents that bring about such change? How does H.G. Wells's *Time Machine* behave in the court room?

This Court filed its decision in *Miller v. State*, 196 Md.App. 658, 11 A.3d 340 (2010). On November 23, 2011, the Court of Appeals filed a Per Curiam Order vacating our judgment and remanding the case to us "for reconsideration in light of *Denisyuk v. State* [422 Md. 462, 30 A.3d 914] ... filed on October 25, 2011."

### *Miller v. State:* The Decision Reaffirmed

We have thoroughly reviewed and reconsidered our decision in *Miller* in light of *Denisyuk* and find nothing that directly and authoritatively requires us to change our earlier decision. We hereby reaffirm it. We do believe, however, that some comment is appropriate to explain why *Denisyuk* does not persuade us to alter our original holding.

The riddle of whether a judicial decision that breaks new ground should receive only prospective, partly retroactive, or fully retroactive application can be incredibly complex. The subtle interaction of the Supreme Court's opinion in *Padilla v. Kentucky*, the Court of Appeals's opinion in *Denisyuk v. State*, and this Court's opinion in *Miller v. State* implicates numerous sub-issues, some of which have never been raised before in a Maryland court. Accordingly, we deemed it advisable to enlist the assistance of counsel in plumbing some of the depths of the retroactivity/prospectivity question. We asked both par-

ties to submit supplemental memoranda addressing five questions:

1. What impact, if any, should *Denisyuk v. State*, 422 Md. 462 [30 A.3d 914] (2011) and *Padilla v. Kentucky*, 559 U.S. ——, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), have on our decision in *Miller v. State?*

2. What exactly is the test for whether a newly announced Supreme Court decision is actually "new law" or is simply an application of an already well-established principle?

3. To what point in the past do we apply that test, to wit, was the arguably retroactive rule "new law" or an "established principle" as of precisely what date?

4. Does *Padilla v. Kentucky's* statement that the distinction between a direct consequence and a collateral consequence of a criminal conviction is "ill-suited" to evaluating non-advice about deportation, 130 S.Ct. at 1482, have any retroactive impact on earlier analyses?

5. As to retroactivity/prospectivity questions generally, should Maryland follow *Teague v. Lane* and, if not, what should be our alternative framework of analysis?

In addition to their legal memoranda, we also had the benefit of counsel's addressing those issues at reargument on September 12, 2012.

### *Denisyuk* Does Not Control *Miller*

There is, to be sure, an obvious overlap in the core concerns of both *Denisyuk* and *Miller*. Both opinions focus on the Supreme Court's decision in *Padilla v. Kentucky*, 559 U.S. ——, 130 S.Ct. 1473, 176 L.Ed.2d 284, filed on March 31, 2010. Both opinions concern the applicability of *Padilla* to the respective situations under review in those two cases. Although the two cases share a general interest in *Padilla*, however, their ultimate situations with respect to *Padilla's* applicability are radically different in two significant regards.

## A. Dissimilar Substantive Issues

A critical, indeed dispositive, difference is with respect to the type of legal issue that might or might not be impacted by the *Padilla* holding. What *Denisyuk* held is that the holding of *Padilla* will enjoy retroactive applicability in Maryland. It is necessary, therefore, to identify that precise holding of *Padilla*. The majority opinion of the Supreme Court held:

> *It is our responsibility* under the Constitution *to ensure that no criminal defendant*—whether a citizen or not—*is left to the "mercies of incompetent counsel." Richardson,* 397 U.S. at 771, 90 S.Ct. 1441, 25 L.Ed.2d 763. To satisfy this responsibility, *we now hold that counsel must inform her client whether his plea carries a risk of deportation.* Our longstanding *Sixth Amendment precedents,* the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country *demand no less.*
>
> Taking as true the basis for his motion for postconviction relief, we have little difficulty concluding that *Padilla has sufficiently alleged that his counsel was constitutionally deficient.* Whether Padilla is entitled to relief will depend on whether he can demonstrate prejudice as a result thereof, a question we do not reach because it was not passed on below.

559 U.S. at ——, 130 S.Ct. at 1486–87, 176 L.Ed.2d at 299 (emphasis supplied).

We must next identify precisely what *Denisyuk* held to be the *Padilla* holding that is now to be given retroactive applicability:

> We conclude, for the reasons that follow, that *the holding of Padilla,* i.e., *that the failure of defense counsel to advise his or her client of the potential immigration consequence of a guilty plea is deficient performance under Strickland, applies retroactively* to all cases arising out of convictions

based on guilty pleas that occurred after April 1, 1997, the effective date of the enactment of the IIRAIRA.

422 Md. at 479–79, 30 A.3d 914 (emphasis supplied).

From its introduction to its conclusion and at all points between, *Denisyuk* focused, as did *Padilla* before it, on the Sixth Amendment right to the effective assistance of counsel as measured by the two-pronged test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Denisyuk's* analysis focused exclusively on the professional performance of defense counsel, as measured not by pre-existing caselaw but by emerging bar association standards of professional responsibility.

In *Miller,* by contrast, the issue before the lower court, the decision of the lower court, and the original opinion of this Court had absolutely nothing to do with the Sixth Amendment or with ineffective assistance of counsel. Our only concern in *Miller* was with the ultimate voluntariness of a guilty plea, as measured by the seminal Maryland cases of *State v. Priet,* 289 Md. 267, 424 A.2d 349 (1981), and *State v. Daughtry,* 419 Md. 35, 18 A.3d 60 (2011). The exclusive focus in *Miller* was on the mind of the defendant, not on the professional performance of the lawyer. The latter, of course, may have some influence on the former, but such influence is by no means automatic and the two issues are far from the same. To compare *Denisyuk* with *Miller* is to compare apples and oranges.

Even assuming a retroactive application of *Padilla* to cases on collateral review generally, the direct impact of *Padilla* on a claim of ineffective assistance, on the one hand, and its, at most, indirect and arguable influence on a claim of guilty plea involuntariness, on the other hand, are by no means the same. The first is directly dispositive, at least with respect to the performance prong of *Strickland v. Washington.* The latter would be, at most, indirect and the arguable influence would be extremely problematic.

*Denisyuk* stated that, as of April 1, 1997, the failure of defense counsel to advise a non-citizen defendant contemplat-

ing a guilty plea that a conviction might result in ultimate deportation would amount to, *ipso facto,* the failure to satisfy the performance prong of *Strickland v. Washington.* As the Court of Appeals announced, 422 Md. at 478–79, 30 A.3d 914:

> We conclude, for the reasons that follow, that *the holding of Padilla,* i.e., that *the failure of defense counsel to advise his or her client of the potential immigration consequence of a guilty plea is deficient performance under Strickland,* applies retroactively to all cases arising out of convictions based on guilty pleas that occurred after April 1, 1997, the effective date of the enactment of the IIRAIRA.

(Emphasis supplied). That's all there is to it! The Sixth Amendment analysis is over and the case, if it is a Sixth Amendment case, is decided.

An assessment of the voluntariness of a guilty plea, by diametric contrast, is never so automatic or mechanistic an exercise. For the very different criteria that determine the voluntariness of a guilty plea, see *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). All pertinent factors will enter into the analysis and voluntariness will ultimately be assessed only after examining the totality of the circumstances. Judge Harrell described the voluntariness standard in *State v. Daughtry,* 419 Md. 35, 79–80, 18 A.3d 60 (2011):

> Our decision in the present case in no way "overrules prior law and declares a new principle of law." *The law of this State with respect to the voluntariness of guilty pleas has been the same over the past thirty years* since we decided *Priet* (if not longer): "[W]hether, considering the record as a whole, the trial judge could fairly determine that the defendant understood the nature of the charge to which he pleaded guilty." ... Today, *we reaffirm this "totality of the circumstances" approach to determining the voluntariness of guilty pleas.*

(Emphasis supplied).

Bearing directly on the essential fluidity of a voluntariness assessment, as opposed to the more mechanistic Sixth Amend-

ment assessment, are the dissenting voices of Judge Battaglia and Judge Murphy in *Denisyuk* itself. After deciding that defense counsel had failed the *Strickland* prejudice prong, the *Denisyuk* majority had gone on to accept the trial judge's factfinding that had the defendant been aware of the possibility of deportation, he would never have pled guilty. It was that further finding that for the majority satisfied *Strickland's* prejudice prong. It was at that point, however, that Judges Battaglia and Murphy bridled. Judge Battaglia pointed out that, as a matter of common sense, a number of circumstances might persuade a defendant voluntarily to plead guilty notwithstanding a risk of future deportation. The plea may have made good sense at the time but, with the benefit of hindsight once the sentence has been served, it is easy to have buyer's remorse about the plea. Judge Battaglia's point was that the plea itself may have been voluntary even if the advice that preceded it had constituted ineffective assistance. The two issues are not clones of each other.

One of the prominent factors in a defendant's decision to plead guilty, Judge Battaglia's dissent also points out, may be the strength of the State's case. If the State's case is so watertight that a conviction is virtually inevitable regardless of the trial mode selected, a guilty plea does not really give away very much. The unspoken but highly dubious assumption of *Padilla,* on the other hand, seems to be that without the antecedent guilty plea there would be no conviction. If, however, a conviction is a virtual certainty in any event, the choice of the trial modality will have little or no effect on the ultimate deportation issue. To the extent to which the choice of the trial modality will have little effect on deportation, the risk of deportation conversely will have little effect on the choice of the trial modality. On the issue of the effective assistance of counsel, the failure to advise about the deportation risk may be, *ipso facto,* dispositive. On the very different issue of the voluntariness of the guilty plea, by contrast, the ineffective assistance may have no catalytic effect at all. The one issue does not control the other.

Judge Battaglia also pointed out that another big factor in assessing the voluntariness of a guilty plea may be that of how good a deal the defendant is getting out of the plea bargain. "Whether the benefit obtained from the guilty plea was substantial also has been a frequent consideration among trial courts." 422 Md. at 492, 30 A.3d 914. Many criminal defendants are neither far-sighted nor visionary. The risk of deportation at some future time might have little weight beside the palpable reward of less hard jail time right now. It is not inconceivable that a defendant might make the pragmatic decision that a bird in the hand is worth two in the bush or that less jail time is a good deal even if the non-jail time is to be spent in Mexico. The *Denisyuk* dissent of Judges Battaglia and Murphy counsels against accepting at face value every self-serving declaration made by a convicted criminal, sometimes long after the fact.

Maryland Rule 4–242(e), albeit not constitutional, is also a concrete illustration that the issues of 1) the furnishing of advice about deportation, on the one hand, and 2) the voluntariness of even an unadvised guilty plea, on the other hand, are distinct questions and that decisions with respect to them could go in diametrically different directions. Subsection (e), added to the rule in 1999, provides, in pertinent part:

> (e) Collateral consequences of a plea of guilty or nolo contendere. Before the court accepts a plea of guilty or nolo contendere, the court, the State's Attorney, the attorney for the defendant, or any combination thereof shall advise the defendant (1) that by entering the plea, *if the defendant is not a United States citizen, the defendant may face additional consequences of deportation,* detention, or ineligibility for citizenship.... *The omission of advice concerning the collateral consequences of a plea does not itself mandate that the plea be declared invalid.*

(Emphasis supplied).

In *Denisyuk* itself, 422 Md. at 484 n. 9, 30 A.3d 914 the majority opinion quoted extensively from Rule 4–242(e) and expressly pointed out that when the advice mandated by the

rule is not given, the unadvised defendant is "permit[ted] collateral challenges based on ineffective assistance of counsel" but that the guilty plea itself will not necessarily be invalidated.

The minutes of the April 24, 1998, meeting of the Court of Appeals Standing Committee on Rules of Practice and Procedure reflect *the intention of the drafters of Rule 4–242(e) to permit collateral challenges, based on ineffective assistance of counsel,* to a plea that did not include on-the-record advice concerning immigration consequences:

> The Vice Chair expressed her disagreement with the fact that if a judge fails to advise the defendant about the consequences of a guilty plea, no remedy exists, even if that defendant suffers dire consequences. Some other states provide that if the advice is not given, the plea can be invalidated. The Chair pointed out that there are two aspects to this. One is that *the defendant can get post-conviction relief based on inadequate advice of counsel. The Rule says that the guilty plea cannot be attacked, but does not preclude postconviction relief. U.S. citizens may not ask for their pleas to be set aside because the judge did not give the advice about immigration consequences. If a particular defendant is unfairly prejudiced, that defendant's right to competent defense counsel should cover this situation.*

(Emphasis supplied).

■ The Committee Note to the rule amendment unequivocally states that the addition of subsection (e) to Rule 4–242 "does not overrule *Yoswick v. State,* 347 Md. 228, 700 A.2d 251 (1997) and *Daley v. State,* 61 Md.App. 486, 487 A.2d 320 (1985)." *Yoswick* states, 347 Md. at 240, 700 A.2d 251, "*[A] plea of guilty is not rendered involuntary* in the constitutional sense if the defendant is not informed of the collateral consequences." (Emphasis supplied). We will further discuss those cases *infra.* We repeat that our *Miller v. State* deals only with the voluntariness of a guilty plea. *Padilla v. Kentucky,* for its part, does not deal with and has absolutely

nothing to say about the voluntariness of a guilty plea. The Court of Appeals's opinion in *Denisyuk v. State* also does not deal with and has absolutely nothing to say about the voluntariness of a guilty plea. Conversely, the retroactive Sixth Amendment relief sanctioned by *Denisyuk* was never requested by Miller. In denying coram nobis relief, Judge Lamasney had no occasion even to consider *Strickland v. Washington* or the Sixth Amendment right to the effective assistance of counsel. The petition for coram nobis relief never so much as mentioned the Sixth Amendment, and the subject was not raised at the subsequent hearing. Our opinion in *Miller v. State* was not predicated on the Sixth Amendment in any way. The failure of a defense attorney to satisfy the performance prong of *Strickland v. Washington* does not *ipso facto* render a guilty plea involuntary. This is our primary reason for concluding, on reconsideration, that *Denisyuk v. State* neither compels nor persuades us to reach a different result in *Miller v. State*. The two cases deal with totally different subjects.

## B. A Temporal Dissimilarity: "The times they are a-changin' "[1]

How does the law deal with the fourth dimension? With the possible exception of the natural rights of man in the eyes of Eighteenth Century legal philosophers, every legal principle, no matter how venerable now, once was new. The right to trial by jury has long been cherished, but it was new at the Assize of Clarendon in 1166. Its evolution into a generally accepted trial procedure came appreciably later. It is now a commonplace, of course, that every defendant is entitled to the "law of the land," but that concept was new when King John signed the Magna Charta on June 15, 1215. Its ripening into a compelling reality took decades, if not centuries. We treat today as long established the entitlement of a defendant to confront his accusers, but that notion was not yet born when Sir Walter Raleigh was tried for treason in 1603. Every precept we now take for granted had a beginning, and its

---

1. Bob Dylan (1964).

growth into something to be taken for granted was never instantaneous. So is it with advice about the risk of deportation.

Even if, *arguendo*, some aspect of *Padilla v. Kentucky* (not its Sixth Amendment holding, of course, but some of its reasoning process, such as its rejection of the distinction between direct consequences and collateral consequences) were deemed to have, at least arguably, some possible retroactive effect on our analysis in *Miller*, the retroactive application mandated by the time frame announced in *Denisyuk* would not be similarly mandated by the very different time frame in *Miller*.

In dealing with questions of prospectivity and retroactivity, the search for a solution lies not in pinpointing when a new idea is born but in identifying that point in its evolution when it becomes so widely recognized that its acceptance can be said to be, in the language of the Supreme Court, "compelled by existing precedent."

Are we concerned in this case, for instance, with the state of the law on March 31, 2010, the date on which *Padilla v. Kentucky* was decided? Or are we concerned with the state of the law on March 7, 2007, the date on which Denisyuk's criminal conviction became final? Or are we concerned with the state of the law on September 1, 1999, the date on which Miller's criminal conviction became final? Or are we possibly concerned with the state of the law on some other date? These are all very different questions, possibly yielding very different answers. We cannot even begin, therefore, the assessment process until we know what we are looking for. We need to know **what** is the test to be applied? and we need to know **when** is that test to be applied? We also need to know **where** to look to get the answers to these questions. What is our controlling retroactivity law?

### Our Questions to Counsel

With respect to each of these three critical questions, we sought the input of counsel. In terms of **What** is the test to be applied?, we asked:

What exactly is the test for whether a newly announced Supreme Court decision is actually "new law" or is simply an application of an already well-established principle?

With respect to the question of **When** is that test to be applied?, we asked:

To what point in the past do we apply that test, to wit, was the arguably retroactive rule "new law" or an "established principle" as of precisely what date?

In terms of **Where** do we look for the answers?, we asked:

As to retroactivity/prospectivity questions generally, should Maryland follow *Teague v. Lane* and, if not, what should be our alternative framework of analysis?

### Maryland Follows *Teague v. Lane*

Whatever the future may hold, Maryland in the past has regularly and invariably followed the Supreme Court's guidance on the issue of retroactivity/prospectivity and Maryland, for the present, continues to follow the Supreme Court guidelines. Those Supreme Court guidelines are to be found in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and in its extensive progeny over the course of the last 23 years. It is a highly sophisticated and meticulously integrated body of law, and we know of no state that has rejected it for some alternative framework of analysis.

Beginning with *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Supreme Court spent a troubled quarter of a century grappling for the first time with the profoundly complex problems posed by the issue of retroactivity. After numerous instances of trial and error and with the benefit of massive and learned academic commentary, however, it ultimately forged, beginning with *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) and culminating with *Teague v. Lane* in 1989, a tightly integrated and doctrinally consistent body of law.[2]

---

**2.** For an excellent short survey of the turbulent early development of retroactivity/prospectivity law between *Linkletter v. Walker* in 1965 and

Throughout the troubled but formative first quarter of a century, the heavy intellectual lifting was done by Justice John Marshall Harlan, first in a penetrating dissent in *Desist v. United States*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) and then in a comprehensive overview of the entire field in his concurring and dissenting opinion in *Mackey v. United States*, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404, in 1971. It was Justice Harlan's insight that was partially embraced by *Griffith v. Kentucky* in 1987 and fully accepted by *Teague v. Lane* in 1989. It was in *Griffith v. Kentucky* that the Court first developed the concept of quasi-retroactive applicability. If the Supreme Court ruling being examined is deemed to be "new law," generally speaking it will not be applied retroactively. What *Griffith* established, however, is that the new law will, quasi-retroactively, be applied to all cases that are not yet final, in the sense that they are still on actual or potential direct review. Two years later, *Teague v. Lane* proceeded to fill in the rest of the retroactivity/prospectivity doctrine. Because the forging of this new highly sophisticated and tightly integrated body of law only culminated with *Griffith* in 1987 and *Teague* in 1989, however, it is highly treacherous to cite any Supreme Court decision from the chaotic two decades that preceded 1987. The only exception to this caveat would be the trail-blazing Harlan dissents in *Desist v. United States* (1969) and *Mackey v. United States* (1971).

Justice O'Connor's seminal opinion in *Teague* was, to be sure, simply a plurality opinion. That frailty in the pedigree, however, did not last long. *Teague* was decided on February 22, 1989. The *Teague* standard was adopted by the majority of the Court four months later in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and has enjoyed rock-solid majority status ever since. *Danforth v. Minnesota*, 552 U.S. 264, 266 n. 1, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008) ("Although *Teague* was a plurality opinion that drew support

---

*Teague v. Lane* in 1989, see the excellent recapitulation by Chief Justice Roberts in his dissenting opinion in *Danforth v. Minnesota*, 552 U.S. 264, 293–303, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008).

from only four Members of the Court, the *Teague* rule was affirmed and applied by a majority of the Court shortly thereafter."). See also *Wright v. West*, 505 U.S. 277, 291, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992). For the past 23 years, *Teague's* comprehensive coverage of the field has been universally followed and respected.

We are not unmindful of the dicta in a footnote in *Denisyuk*, 422 Md. at 480 n. 8, 30 A.3d 914 observing that "Maryland has not adopted *Teague*, nor must it." Significantly, however, Maryland, despite the dicta, has not rejected *Teague*. Neither has it forged a comprehensive retroactivity/prospectivity body of law of its own, nor must it.

The Maryland case law, moreover, has tracked the Supreme Court's treatment of the subject precisely and has never betrayed the slightest tendency to wander off on its own. Judge Marvin Smith undertook the first detailed examination of retroactivity law for Maryland in *Wiggins v. State*, 275 Md. 689, 344 A.2d 80 (1975). He began his analysis of retroactivity with the sentence, "The genesis of the modern retroactivity doctrine in criminal litigation is *Linkletter v. Walker* (1965)." His ensuing analysis cited 22 Supreme Court opinions and quoted at significant length from 10 of them.

The retroactivity decision in *State v. Hicks*, 285 Md. 310, 403 A.2d 356 (1979), also relied on *Linkletter v. Walker* (1965) and *Stovall v. Denno* (1967), as well as on two other Supreme Court cases dealing with retroactivity in civil cases. Holding that even a ruling that is "new law" will apply to cases that are still on direct review, Judge Smith in *McClain v. State*, 288 Md. 456, 419 A.2d 369 (1980), actually anticipated what the Supreme Court would subsequently do in *Griffith v. Kentucky* (1987) and *Teague v. Lane* (1989), after analyzing at great length and then adopting the analysis urged by Justice Harlan in his dissents in *Desist* (1969) and *Mackey* (1971).

Chief Judge Robert Murphy also engaged in a significant retroactivity analysis for the Court of Appeals in *Potts v. State*, 300 Md. 567, 479 A.2d 1335 (1984). That decision relied almost totally on the Supreme Court opinions of *United States v. Johnson* (1982), *Linkletter v. Walker* (1965), *Solem v.*

*Stumes* (1984), and *Stovall v. Denno* (1967). The opinion also cited seven decisions from various United States Courts of Appeals interpreting the Supreme Court law.

The subsequent Maryland caselaw has not broken stride in its fundamental dependence on Supreme Court retroactivity law. *Houghton v. County Commissioners*, 307 Md. 216, 513 A.2d 291 (1986), relied on the Supreme Court cases of *United States v. Johnson* (1982), *Chevron Oil Co. v. Huson* (1971), and *Hanover Shoe, Inc. v. United Shoe Mach. Corp.* (1968). *American Trucking Assoc. v. Goldstein*, 312 Md. 583, 541 A.2d 955 (1988), relied on the Supreme Court cases of *Hanover Shoe* (1968) and *Linkletter* (1965), as well as on Lawrence Tribe, *American Constitutional Law* (2d ed.1988). The extremely brief reference to retroactivity in *Owens–Illinois v. Zenobia*, 325 Md. 420, 471, 601 A.2d 633 (1992), cited to *Linkletter* (1965). The Maryland decisions relied on by *Walker v. State*, 343 Md. 629, 637–40, 684 A.2d 429 (1996), were Maryland decisions that had, in turn, relied on federal law.

In *Warrick v. State*, 108 Md.App. 108, 671 A.2d 51 (1996), Judge Harrell for this Court not only relied on the Supreme Court decisions in *Yates v. Aiken* (1988), *Griffith v. Kentucky* (1987), and *Stovall v. Denno* (1967), but also stated that Maryland would use the same retroactivity analysis on local statutes and rules of court as it has traditionally used in dealing with federal constitutional rulings:

> The question of retroactivity in case law is most frequently found in the context of new constitutional rules. *Here,* however, *no constitutional question is implicated. Nonetheless, the principles set forth here apply equally in the context of new constitutional rules as they do in the present context. See State v. Hicks*, 285 Md. 310, 338, 403 A.2d 356 (1979) *("while Stovall, Linkletter,* and *Wiggins involved new constitutional rulings, the principles there announced apply as well to new interpretations of statutory provisions or rules.").*

108 Md.App. at 112 n. 1, 671 A.2d 51 (emphasis supplied).

*State v. Daughtry*, 419 Md. 35, 77–80, 18 A.3d 60 (2011), did not depart in any way from settled Supreme Court retroactivi-

ty law. The Maryland cases that it cited were all, in their turn, decisions that had cited and that completely followed established federal law. Judge James Eyler's opinion in *Allen v. State*, 204 Md.App. 701, 42 A.3d 708 (2012), is a thorough summary and analysis of the development of the Supreme Court's retroactivity/prospectivity law from *Linkletter v. Walker* in 1965 through *Teague v. Lane* in 1989. Any minor variations in phraseology between the Supreme Court originals and the Maryland restatements of those originals are more a matter of random style than of any deliberate intention to have Maryland go off in a different direction.

Even to speak, therefore, of a "Maryland retroactivity jurisprudence" is an *ipse dixit* without any foundation. It simply does not exist. It is inconceivable, moreover, that Maryland would ever wish to undertake the incredibly daunting task of creating an alternative and independent body of retroactivity doctrine in opposition to *Teague v. Lane*. Maryland has never voiced a single complaint about *Teague v. Lane*, except perhaps for the completely unpersuasive dicta in *Denisyuk*.

*Padilla v. Kentucky* is a decision of the Supreme Court of the United States. The issue of whether *Padilla* announced new law and shall be applied only prospectively, on the one hand, or simply applied a settled principle and should be applied retroactively, on the other hand, is currently before the Supreme Court in its review of *Chaidez v. United States*, 655 F.3d 684 (7th Cir.2011). It is scheduled for argument on October 30, 2012. Should the Supreme Court decide that *Padilla* is not retroactive, it is inconceivable why Maryland would wish to go in an opposite direction from the Supreme Court and, effectively speaking, from the rest of the country. It is difficult to imagine what criteria Maryland would then have to invent to justify such a departure. It is also difficult to imagine what purpose would be served by doing so. As Judge Adkins noted in her *Denisyuk* dissent, 422 Md. at 494 n. 1, 30 A.3d 914 "[w]e are not bound by the federal standard, but it is persuasive."

### Is There One *Strickland* Test Or Many?

■ In applying *Padilla* to the Sixth Amendment's right to effective assistance of counsel and to the two-pronged standard of *Strickland v. Washington,* moreover, Maryland's hypothetical departure from the national norm could pose insurmountable problems. *Strickland's* performance prong measures the performance of counsel against a national norm. See *Roe v. Flores–Ortega,* 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) ("[W]hile States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices."); *Bobby v. Van Hook,* 558 U.S. 4, 17, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009). How could a Maryland lawyer be deemed ineffective for failing to do what lawyers in the rest of the country had never have been required to do? For the performance prong of *Strickland,* fragmentation will not work.

To appreciate the totally fruitless folly of Maryland's going off on its own, one need only posit the hypothetical dilemma that would be produced if 1) the Supreme Court should decide that *Padilla v. Kentucky* will not apply retroactively to criminal convictions that were already final when *Padilla* was decided but 2) Maryland should decide that *Padilla* will be applied retroactively to such cases in Maryland. With respect to those cases that were already final, Maryland would be retroactively imposing a higher performance standard on defense attorneys than the Supreme Court would be imposing on lawyers in the rest of the country. To fail to have satisfied the heightened Maryland standard, therefore, could not amount to ineffective assistance of counsel within the contemplation of the Sixth Amendment of the United States Constitution. A heightened Maryland standard cannot raise the standard for *Strickland v. Washington's* performance prong.

Posit two otherwise indistinguishable guilty pleas ten years ago, one in Maryland and the other in Delaware. In each case, the lawyer failed to warn the client about the risk of

deportation. In each case the client plead guilty and was ultimately deported. Is it conceivable that the freshly vindicated Maryland defendant received ineffective assistance under *Strickland* and is now luxuriating in Ocean City, whereas his banished Delaware counterpart received adequate assistance under *Strickland* and is still languishing in Bangladesh? The same *Strickland v. Washington* cannot produce such diametrically different results.

There is only one Sixth Amendment standard, not fifty-one. The very existence of the two-pronged test of *Strickland v. Washington* is federal constitutional law, not independent Maryland law. Maryland has no *Strickland v. Washington* of its own. To ignore the Supreme Court, therefore, would require not only the invention of an independent retroactivity/prospectivity law but the invention of an independent right to the assistance of counsel law as well. What would be the point?

In any event, until the Court of Appeals holds that Maryland courts are required to do otherwise, this Court will continue to accept *Teague v. Lane* and its progeny as controlling.

### What Is the Test of Newness? When Does It Apply?

The twin questions of What is the test? and When shall the test be applied? are so inextricably intertwined that an opinion that answers one of those questions invariably answers the other in the same breath. The touchstone for determining not only what "new law" is but also for pinpointing when the newness of the law shall be measured is *Teague v. Lane,* 489 U.S. 288, 301, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), itself:

It is admittedly often difficult to determine when a case announces a new rule, and we do not attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes. *In general,* however, a *case announces a new rule when it breaks new ground or imposes a new obligation* on the States or the Federal Government. . . . To put it differently, *a case announces a new rule*

*if the result was not dictated by precedent existing at the time the defendant's conviction became final.*

(Emphasis supplied). That precise answer as to, "What is a new rule?" and as to, "When shall the measurement be taken?" was reaffirmed four months later in *Penry v. Lynaugh,* 492 U.S. 302, 314, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). In her dissenting opinion in *Denisyuk,* 422 Md. at 493–94, 30 A.3d 914 Judge Adkins agreed that this was the definition of "new law" articulated by *Teague v. Lane:*

> It is clear that *Padilla* created a new rule under the federal standard for retroactivity. In *Teague v. Lane,* the Supreme Court set forth the federal standard, holding that *a rule is "new," and thus not applicable retroactively, if "the result was not dictated by precedent existing at the time the defendant's conviction became final."*

(Emphasis supplied).

Within the year after *Teague v. Lane,* the Supreme Court was called upon in *Butler v. McKellar,* 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990), to decide whether Butler, whose conviction had become final in 1982, was entitled to the retroactive benefit of the Supreme Court's 1988 decision in *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). The newness test, significantly, was administered not as of June 15,1988, when *Arizona v. Roberson* was filed, but as of 1982, when Butler's conviction had become final. The Supreme Court held that the rule ultimately announced in *Roberson* was not "dictated by precedent existing *at the time the petitioner's [Butler's] conviction became final* " in 1982. 494 U.S. at 412, 110 S.Ct. 1212 (emphasis supplied).

*Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), was decided the same day as *Butler v. McKellar.* The Supreme Court both articulated the controlling rule and explained its salutary purpose:

> "The 'new rule' principle therefore validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to

later decisions." Under this functional view of what constitutes a new rule, our task is to determine *whether a state court considering Parks' claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule Parks seeks was required by the Constitution.*

494 U.S. at 488, 110 S.Ct. 1257 (emphasis supplied).

The Court there held that the rule that Parks was contending for in 1990 would not have been "compelled by existing precedent" as of the time that Parks's conviction became final in 1982. It was, therefore, new law and was not retroactively binding. See also *Sawyer v. Smith,* 497 U.S. 227, 235, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) ("Examination of our Eighth Amendment authorities that preceded *Caldwell* [*v. Mississippi* in 1985] shows that it was not dictated by prior precedent existing *at the time the defendant's conviction became final* [on April 2, 1984].") (emphasis supplied).

In *Graham v. Collins,* 506 U.S. 461, 467–68, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993), the day that Graham's conviction became final on September 10, 1984 was held to be the critical date for surveying the legal landscape and for determining whether a future ruling could be deemed to have been dictated or compelled by the law existing back at that earlier time.

*[U]nless reasonable jurists hearing petitioner's claim at the time his conviction became final "would have felt compelled by existing precedent" to rule in his favor, we are barred from doing so now.*

. . . .

Surveying *the legal landscape as it then existed,* we conclude that *it would have been anything but clear* to reasonable jurists *in 1984* that petitioner's sentencing proceeding did not comport with the Constitution.

(Emphasis supplied).

In *O'Dell v. Netherland,* 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997), the lay of the legal landscape had to be surveyed as of October 3, 1988, when the petitioner's convic-

tion became final, not as of 1994, when the opinion the petitioner sought to have retroactively applied was decided:

> *Petitioner's conviction became final on October 3, 1988,* when we declined to review the Virginia Supreme Court's decision affirming his sentence on direct review. *Simmons, the rule of which petitioner now seeks to avail himself, was decided in 1994.*

521 U.S. at 157, 117 S.Ct. 1969 (emphasis supplied). The application of the *Teague v. Lane* standard was clear:

> This case presents the question whether the rule set out in *Simmons v. South Carolina* (1994) . . .—was "new" within the meaning of *Teague v. Lane,* and thereby inapplicable to an already final death sentence. We conclude that *it was new,* and that *it cannot, therefore, be used* to disturb petitioner's death sentence, which had been final for six years when *Simmons* was decided.

521 U.S. at 153, 117 S.Ct. 1969 (emphasis supplied).

In *Lambrix v. Singletary,* 520 U.S. 518, 527, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997), the Supreme Court explained the two necessary steps in the retroactivity analysis that a court must always undertake:

> First, *it determines the date upon which the defendant's conviction became final.* Second, *it must* " '*surve[y] the legal landscape as it then existed,* ' and 'determine whether a state court considering [the defendant's] claim *at the time his conviction became final* would have felt *compelled by existing precedent* to conclude that the rule [he] seeks was required by the Constitution."

(Emphasis supplied).

The new Supreme Court decision the retroactivity of which was being considered was *Espinosa v. Florida,* 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). The *Espinosa* opinion had been filed on June 29, 1992. In deciding whether the *Espinosa* holding would apply to the petitioner Lambrix, however, the Supreme Court did not examine the state of the law as of June 29, 1992, but looked, rather, to "the legal

landscape" six years earlier, as of November 24, 1986, when Lambrix's conviction became final.

> Lambrix's *conviction became final on November 24, 1986,* when his time for filing a petition for certiorari expired. Thus, our first and principal task is to *survey the legal landscape as of that date, to determine whether the rule* later announced *in Espinosa was dictated by then-existing precedent*—whether, that is, the unlawfulness of Lambrix's conviction was apparent to all reasonable jurists.

520 U.S. at 527–28, 117 S.Ct. 1517 (emphasis supplied). The Supreme Court concluded that the law later announced on June 29, 1992 was not dictated by precedent existing as of November 24, 1986.

*Caspari v. Bohlen,* 510 U.S. 383, 393, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994), held to the same effect:

> While our cases may not have foreclosed the application of the Double Jeopardy Clause to noncapital sentencing, neither did any of them apply the Clause in that context. On the contrary, [*Pennsylvania v.*] *Goldhammer* [474 U.S. 28, 88 L.Ed.2d 183 (1985) ] and *Strickland* strongly suggested that *Bullington* [*v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) ] was limited to capital sentencing. We therefore conclude that *a reasonable jurist reviewing our precedents at the time respondent's conviction and sentence became final would not have considered the application of the Double Jeopardy Clause to a noncapital sentencing proceeding to be dictated by our precedents.*

(Emphasis supplied).

In *Beard v. Banks,* 542 U.S. 406, 413, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004), the petitioner's conviction had become final in 1987. That, therefore, was the time for surveying the lay of the legal landscape for the newness examination:

> *We must therefore assay the legal landscape as of 1987 and ask "whether the rule later announced in* [*Mills* ] *was* dictated by then—existing precedent—whether, that is, the

*unlawfulness of [respondent's] conviction was apparent to all reasonable jurists."*

(Emphasis supplied).

In *Whorton v. Bockting,* 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007), the habeas corpus petitioner sought to have the 2004 confrontation clause decision of *Crawford v. Washington* applied retroactively to his Nevada conviction which had become final in 1993. Justice Alito posed the issue before the Court:

> This case presents the question whether, under the rules set out in *Teague v. Lane,* our decision in *Crawford v. Washington* [541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177] (2004) is retroactive to cases already final on direct review. We hold that it is not.

549 U.S. at 409, 127 S.Ct. 1173 (citations omitted). It was first decided that the rule announced in *Crawford* would not have been compelled by precedent existing at the time that Bockting's conviction became final in 1993:

> Because the *Crawford* rule was not dictated by the governing precedent existing at the time when respondent's conviction became final, the *Crawford* rule is a new rule.

549 U.S. at 417, 127 S.Ct. 1173. It was also decided that the *Crawford* decision did not qualify for an exception to the bar on retroactivity by virtue of being a "watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding," an exception that is not pertinent to our present analysis.

Our inquiry, therefore, into whether the rule of *Padilla* was new law or was simply the application of an established principle to a fresh factual predicate is not ultimately directed at May 31, 2010, when *Padilla* was decided. Nor, in arguably applying *Denisyuk,* is our inquiry directed at March 7, 2007, when Denisyuk's criminal conviction became final. It is directed at September 1, 1999, when Miller's criminal conviction became final. Simply because the *Padilla* rule might, *arguendo,* have been dictated by existing precedent on May 31, 2010 or might even have been dictated by existing precedent on

March 7, 2007, by no means implies that the same rule would have been dictated or compelled by the precedent that existed eight or eleven years earlier on September 1, 1999. That requires an independent inquiry. It requires a survey of the state of the law at that earlier time.

### What the Test of "New Law" Is Not

Both *Padilla v. Kentucky* itself and *Denisyuk v. State* observed that the *Padilla* result was "a reasonable interpretation of prior law." *Lambrix v. Singletary,* however, points out that that is not the test for when a law is "not new" and may, therefore, be applied retroactively:

> *Most of the dissent is devoted to making a forceful case that Espinosa was a reasonable interpretation of prior law—perhaps even the most reasonable one. But the Teague inquiry*—which is applied to Supreme Court decisions that are, one must hope, usually the most reasonable interpretation of prior law—*requires more than that. It asks whether Espinosa was dictated by precedent—i.e., whether no other interpretation was reasonable.* We think it plain from the above that a jurist considering all the relevant material (and not, like the dissent, considering only the material that favors the *Espinosa* result) *could reasonably have reached a conclusion contrary to our holding* in that case. *Indeed,* both before and after Lambrix's conviction became final, *every court decision we are aware of did so.*

520 U.S. at 538, 117 S.Ct. 1517 (emphasis supplied).

### A Two–Step Measuring Process: New Law Now and New Law Then

A tell-tale insight into how subtle retroactivity/prospectivity analysis can sometimes be is the alarming frequency with which the Supreme Court definitions find it necessary to resort to negative phraseology. The opinions are replete with references to "non-retroactivity" and to the critical definition of what is "not new law." It is easy to lose direction in a hall of mirrors.

Another tricky maneuver is that frequently two separate "old versus new" assessments as of two separate times have to be made. Even when it somehow manages to get the right result, much of the case law does not always seem to be aware of the double diagnosis problem. At the outset, an "old law" versus "settled principle" assessment has to be made with respect to the Supreme Court decision that is the immediate subject of the controversy. This always comes first. *Padilla v. Kentucky* as of March 31, 2010 is a case in point. If the *Padilla* decision is unquestionably "new law," in the sense that it can be said to break new ground by overturning an established precedent or declaring a statute unconstitutional or saying something unquestionably for the first time, then it will apply prospectively to future cases and, of course, to the case being decided and, quasi-retroactively, to all cases still on direct review. Generally speaking, however, such "new law" will, with two relatively esoteric exceptions not here pertinent,[3] not be applied retroactively. In such a case, one "old versus new" assessment is enough. If *Padilla* was, indeed, "new law" on March 31, 2010, the problem is solved. We need not even concern ourselves with, for instance, March 7, 2007, when Denisyuk's criminal conviction became final or with September 1, 1999, when Miller's criminal conviction became final.

If, on the other hand, *Padilla* was simply an application of established precedent, to wit, was "not new law," then, but only then, does the "old versus new" assessment have to be made at yet a second moment in time. There is more involved than the simple binary issue of, "Is *Padilla* retroactive? Yes or no?" If *Padilla* was "not new" on March 31, 2010, that

---

3. The first of the exceptions is that even a "new law" will be applied retroactively if it places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." The second exception to the normal bar on retroactivity is the new law will be retroactive if it requires the observance of "those procedures that ... are implicit in the concept of ordered liberty." *Teague v. Lane,* 489 U.S. at 311, 109 S.Ct. 1060. See also *Danforth v. Minnesota,* 552 U.S. 264, 274–75, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008).

means that it is potentially retroactive. Whether potential retroactivity translates into actual retroactivity, however, must then be assessed on an *ad hoc*, case-by-case basis with respect to an infinite variety of earlier times. It is then that the *Teague v. Lane* definitions come into full play. Would, *e.g.*, the *Padilla* rule that was "not new" on March 31, 2010 also have been "not new," to wit, "compelled or dictated by existing precedent," back on March 7, 2007, when Denisyuk's conviction became final? If so, it will retroactively apply to that conviction. If not, it will not retroactively apply. Even if the *Padilla* rule would have been dictated by the precedent that existed on March 7, 2007, however, that still does not tell us what the state of the existing precedent was back on September 1, 1999, when Miller's conviction became final. That is a totally separate retroactivity question.

### The Pertinent Date For a Retroactivity Test

■ We are not unmindful of the statement in *Denisyuk* that the new *Padilla* requirement was not only established law as of March 31, 2010, but had actually been established law since April 1, 1997, which was the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. That, however, is completely at odds with how *Teague v. Lane* tells us a retroactivity decision must be made. It is, moreover, dicta and we are not persuaded by it. A holding in a case is that which must be decided to render a decision in that case. To reach its result in *Denisyuk*, it was necessary to decide whether the *Padilla* rule would have been dictated or compelled by existing precedent as of March 7, 2007, the date on which Denisyuk's criminal conviction became final. To go into the past ten years beyond 2007 was unnecessary to the decision.

There is, moreover, no way that the April 1, 1997 date could be squeezed into the universally recognized and consistently reiterated *Teague* definition. "Existing precedent" did not change in any way on April 1, 1997. No case was decided on that day. No bar association standard was promulgated on that day. The effective date of the new 1996 deportation law

may, indeed, have created a need for some ameliorative change or for some additional relief, but the need for a thing is not the thing itself. Even if the new deportation law arguably created a need for a change, it did not itself constitute such change. The ameliorative relief, if and when it should ever come, would have to be in the form of new case law being decided or, arguably, new bar association standards being promulgated. We are not told, however, what cases, if any, were decided that would dictate or compel a *Padilla*-type rule or when such new precedents were decided. We are not told what particular bar association standards came into being that mandated a change in the law or precisely when those new standards were promulgated, except for *Padilla's* vague reference to "the last fifteen years." That does not tell us what we need to know with respect to the "existing precedent" as of September 1, 1999.

On April 1, 1997, nobody's criminal conviction became final; yet that ripening into finality is the only event that any Supreme Court opinion has ever pointed to as being the critical moment when the "old versus new" test is to be applied. There is, moreover, no reference to any "existing precedent," or even existing professional standards, *in esse* on April 1, 1997, that could dictate or compel a *Padilla*-type rule as of that date. April 1, 1997 cannot be fitted into any known definition in any of the case law.

In all of the *Padilla* discussions of the history of deportation, moreover, there is a troubling disconnect between the disease and the cure. If the effective date for the IIRAIRA of 1996 created an urgent need for ameliorative relief, the obvious need is for the Executive Branch of the United States government to reform the rigidity of its deportation procedures. If deportation law is too harsh and automatic, then, by all means, it should be reformed. If there is a problem, the obvious source of the problem is with the deportation law itself. That is why we have a United States Congress.

The *Padilla*-type case is a strangely roundabout procedure by which the judicial branch of government is asked to provide

indirectly the ameliorative relief that the executive branch or the legislative branch is fully able to provide directly. It is also a strangely partial cure, providing some relief for defendants who plead guilty but doing absolutely nothing for those other deportable non-citizens who have actually gone to trial.

## *Miller v. State:* The Opinion Revisited

We hereby reissue our opinion in *Miller v. State* in large measure as it read on December 29, 2010, but with significant revisions to bring it up to date and to take into account the intervening decision of *Denisyuk v. State.*

## The Guilty Plea

In the Circuit Court for Prince George's County on June 1, 1999, the appellant, Lincoln Miller, entered a plea of guilty to the charge of possessing 448 grams of cocaine with the intent to distribute. At no time during the plea discussions was the appellant advised on the record by the court or by counsel about any possibly adverse immigration consequences that might result from a conviction. Accepting the plea, which was otherwise voluntary and knowledgeable in every respect, Judge Richard H. Sothoron, Jr., sentenced the appellant to five years of imprisonment without the possibility of parole. The appellant did not appeal that sentence, which he finished serving on June 1, 2004.

## Subsequent Events

Following his release from prison in Maryland, the appellant, who was then 58 years of age, returned to New York State and resumed residence with his wife of 24 years. The appellant is a native of Belize. He had been accorded Lawful Permanent Resident status in the United States in 1981. For all intents and purposes, the appellant's travails in Maryland were ancient history when, in the spring of 2008, he paid a visit to his native Belize. Upon his return to the United States on May 27, 2008, however, he was detained by Immigration and Customs Enforcement agents at the Miami International Airport. On September 29, 2008, deportation pro-

ceedings against him were begun, based on his 1999 conviction in Prince George's County. The removal proceedings are being held in abeyance, pending the resolution of this appeal.

## Coram Nobis

On June 18, 2009, the appellant filed a Petition for a Writ of Error Coram Nobis in the Circuit Court for Prince George's County. He alleged that

"his guilty plea had not been tendered knowingly, voluntarily, and intelligently, in light of the facts that: (1) he was not advised of the immigration consequences attendant to his plea, and (2) he was not advised, prior to acceptance of his plea, that by pleading guilty he was foregoing his right to direct appeal, and was thus limited to filing an application for leave to appeal, on four limited grounds."

On August 21, 2009, a hearing was held on the coram nobis petition before Judge Maureen Lamasney. The appellant was the only witness to testify. On October 5, 2009, Judge Lamasney filed an Opinion and Order denying the coram nobis petition. The critical part of Judge Lamasney's opinion reads as follows:

It is clear from the record that the Plea Court did not inform the petitioner of either possible immigration consequences or the right to a direct automatic appeal to the Court of Special Appeals if convicted after a trial. However, *consequences of the plea" has been interpreted to mean "direct" consequences. A consequence is considered direct only if "the result represents a definite, immediate and largely automatic effect on the range of the defendant's punishment", Cuthrell v. Director of Patuxent,* 475 F.2d 1364 (4th Cir.1973).

(Emphasis supplied). By way of further making the point that *Miller* was not a Sixth Amendment case, it is worth noting that Judge Lamasney did not comment on the failure of defense counsel to inform the defendant about the risk of deportation but commented only about the failure of the trial judge to have done so.

## The Holding of *Padilla v. Kentucky*

The appellant now appeals from that denial, claiming that *Padilla v. Kentucky* has, *nunc pro tunc*, rendered Judge Lamasney's rationale untenable. The *Padilla* opinion was filed on March 31, 2010. Its holding was that the failure of a criminal defense attorney to warn a client, contemplating the entering of a guilty plea, about deportation as a possible consequence of conviction was, *ipso facto*, an instance of ineffective assistance of counsel pursuant to the performance prong of *Strickland v. Washington*.[4] On October 25, 2011, moreover, the Court of Appeals filed its opinion in *Denisyuk v. State*, in which it stated that the *Padilla* holding with respect to a Sixth Amendment claim of ineffective assistance of counsel would enjoy retroactive effect in Maryland, dating back to April 1, 1997.

As we have already fully discussed in that section of this opinion in which we explained why we do not consider our decision in this case to be controlled by either *Padilla* or *Denisyuk*, those cases have no direct bearing on the *Miller* case. They were both dealing with the Sixth Amendment right to the effective assistance of counsel generally and with the performance prong of *Strickland v. Washington* specifically. The Petition for a Writ of Error Coram Nobis in this case, filed in the Circuit Court for Prince George's County on June 18, 2009, did not raise a Sixth Amendment issue. The coram nobis petition raised only Miller's claim that his guilty plea was not voluntary. As we fully explained *supra*, the effective assistance of counsel and the voluntariness of a guilty plea are separate and distinct issues. They are not joined at the hip. A finding of ineffective assistance would by no means compel a

---

4. *Padilla v. Kentucky*, as noted above, did not decide that the failure of his attorney to advise Padilla about the possibility of deportation constituted the ineffective assistance of counsel pursuant to *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). It decided only that the failure so to advise represented a failure to satisfy the performance prong of *Strickland's* two-pronged test. The case was remanded to Kentucky for consideration of whether the prejudice prong had or had not also been violated.

finding that a guilty plea was involuntary, as has been fully discussed. Accordingly, we hold that *Padilla v. Kentucky* does not, as Miller alleges, render Judge Lamasney's denial of the coram nobis petition erroneous. This is our primary holding on this appeal.

## A Precautionary Further Analysis

What we have just held should be enough to dispose of the appeal before us. A genuine concern for the law's repose in this case, however, behooves us to go further. There is something fundamentally disturbing about revisiting a guilty plea in a case that became final 13 years ago. The basic interest in finality in the adjudicative process was poignantly expressed by Justice Harlan in his concurring opinion in *Mackey v. United States*, 401 U.S. 667, 690–91, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971):

> There are operative competing policies in this area which I regard as substantial. *It is*, I believe, *a matter of fundamental import that there be a visible end to the litigable aspect of the criminal process. Finality in the criminal law is an end which must always be kept in plain view.* ... If *law*, criminal or otherwise, is worth having and enforcing, it *must at some time provide a definitive answer to the questions litigants present or else it never provides an answer at all.* ... *No one*, not criminal defendants, not the judicial system, not society as a whole *is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved.*
>
> *A rule of law that fails to take account of these finality interests would* do more than *subvert the criminal process itself.* It would also seriously distort the very limited resources society has allocated to the criminal process. While men languish in jail, not uncommonly for over a year, awaiting a first trial on their guilt or innocence, *it is not easy to justify* expending substantial quantities of the time and energies of judges, prosecutors, and defense lawyers

*litigating the validity under present law of criminal convictions that were perfectly free from error when made final.* (Emphasis supplied).

### The Distinction Between Direct and Collateral Consequences

We can well imagine a further argument that Miller, in trying to fend off that finality, might make. Although, in our judgment, it would have no merit, it could still be time-consuming to litigate it. In the interest of finality, therefore, we will try to strike it down before it gets off the ground. Judge Lamasney's decision was based upon the well-settled Maryland (and, indeed, national) law that a guilty plea may not be attacked on the ground that the defendant had not been advised with respect to the collateral consequences (as opposed to direct consequences) of the conviction to which he was pleading guilty. *Cuthrell v. Director of Patuxent,* 475 F.2d 1364 (1973), the decision of the United States Court of Appeals for the Fourth Circuit on which Judge Lamasney relied, well reflected the prevailing pre-*Padilla* national law.

> The law is clear that *a valid plea of guilty requires that the defendant be made aware of all "the direct consequences of his plea."* By the same token, it is equally well settled that, before pleading, *the defendant need not be advised of all collateral consequences of his plea,* or, as one Court has phrased it, of all "possible ancillary or consequential results which are peculiar to the individual and which may flow from a conviction of a plea of guilty."

475 F.2d at 1365–66 (emphasis supplied).

In the course of its analysis in *Padilla,* the majority opinion of the Supreme Court made one reference to the widely recognized distinction between the direct consequences and the collateral consequences of a criminal conviction:

> *We,* however, *have never applied a distinction between direct and collateral consequences* to define the scope of constitutionally "reasonable professional assistance" required under *Strickland. Whether that distinction is ap-*

*propriate* is a question *we need not consider* in this case because of the unique nature of deportation.

. . . .

*Deportation* as a consequence of a criminal conviction *is, because of its close connection to the criminal process, uniquely difficult to classify* as either a direct or a collateral consequence. *The collateral versus direct distinction is thus ill-suited to evaluating a Strickland claim* concerning the specific risk of deportation. . . . *Strickland applies to Padilla's claim.*

559 U.S. at ——, 130 S.Ct. at 1481–82, 176 L.Ed.2d at 293–94 (emphasis supplied).

It is extremely hard to know what to make, if anything, of that statement. The mere fact that the Supreme Court itself had "never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under *Strickland*" says nothing except that the Supreme Court had never addressed the issue. The Supreme Court may never have approved the distinction but neither had the Supreme Court ever disapproved it. That the Supreme Court had never addressed the issue did not negate the fact that it was a widely, if not universally, recognized distinction elsewhere in the law. The Supreme Court, of course, is not the only source of law. The Court's further observation that it "need not consider" whether the "distinction is appropriate" is cryptic in the extreme.

It was, of course, this observation by the Supreme Court that caused us to address another question to counsel for our guidance upon this reconsideration:

**Does *Padilla v. Kentucky's* statement that the distinction between a direct consequence and a collateral consequence of a criminal conviction is "ill-suited" to evaluating non-advice about deportation, 130 S.Ct. at 1482, have any retroactive impact on earlier analyses?**

█ The Court's observation that "deportation as a consequence of a criminal conviction" is "uniquely difficult to classify as either a direct or a collateral consequence" because of

"its close connection to the criminal process" is puzzling. Almost all, if not all, collateral consequences of a criminal conviction share that "close connection to the criminal process" that produced the collateral consequence. It is only because of "the criminal process" that any of those consequences come about. In the original opinion of this Court in our *State v. Denisyuk,* 191 Md.App. 408, 443–44, 991 A.2d 1275 (2010), we undertook, by providing examples, to point out just what a "collateral consequence" of a criminal conviction might be:

What makes certain costs of a criminal conviction collateral? Let us count the ways. Or, at least, some of them as illustrative of the larger phenomenon. If following a conviction for drunken driving, *the Motor Vehicle Administration should suspend or revoke one's driving privileges,* that's a collateral consequence. If following a felony conviction, *one may no longer vote or hold public office,* that's a collateral consequence. If following a conviction, *one may face enhanced sentences for future crimes,* that's a collateral consequence. If following a conviction, *one is found guilty of a violation of probation* for some earlier offense, that's also a collateral consequence. If *one is not eligible for parole or only for delayed parole,* that's a collateral consequence. *A prohibition on the right to bear firearms* is a collateral consequence.

If following a conviction for a sexual offense, *one is required to register as a sex offender,* that's a collateral consequence.... If following a conviction for child abuse, *one is barred from employment as a teacher or a pediatrician or a scoutmaster,* that too is a collateral consequence. If one's passport is lifted and *one may not travel abroad,* that's a collateral consequence. If following a guilty plea to bribery, *one is forced to resign the Vice Presidency of the United States,* that's a collateral consequence. If following a hypothetical plea to covering up a "third-rate burglary," *one could be impeached as President of the United States,* even that would be a collateral consequence. And, of course, *being deported is also a collateral consequence* ....

> In each of these instances, *it is not the criminal court judge who takes the plea who imposes the consequence. The source of the consequence is some other person or some other arm of government or the operation of some other law. That's what makes it collateral.*

(Emphasis supplied). *See also* Gabriel J. Chin & Richard W. Holmes, Jr., "Effective Assistance of Counsel and the Consequences of Guilty Pleas," 87 *Cornell L.Rev.* 697, 699 (2002):

> By virtue of the conviction, the offender may become ineligible for federally funded health care benefits, food stamps, and Temporary Assistance for Needy Families and housing assistance. She is ineligible for federal educational aid.

There is nothing unique about deportation.[5]

It is also important to keep in mind exactly what it is that makes a collateral consequence collateral. The Court of Appeals for the First Circuit explained it perfectly in *United States v. Gonzalez*, 202 F.3d 20, 27 (1st Cir.2000):

> *What renders the plea's immigration effects "collateral" is not that they arise "virtually by operation of law," but the fact that deportation is "not the sentence of the court which accepts the plea* but of another agency over which the trial judge has no control and for which he has no responsibility."

(Emphasis supplied). See also *Fruchtman v. Kenton*, 531 F.2d 946, 949 (9th Cir.1976); *Michel v. United States*, 507 F.2d 461, 465 (2d Cir.1974); *United States v. George*, 869 F.2d 333, 337 (7th Cir.1989).

---

**5.** It is not being overly skeptical to wonder if some of the reversals in deportation cases are not result-oriented because of the widespread disapprobation of the harsh and draconic actions of the Department of Homeland Security on the subject of deportation. It is not the job of the courts, however, to compensate for the behavior of the executive branch of the federal government. There are better remedial measures that do not run the risk of compromising the law's doctrinal symmetry. See, e.g., *Judulang v. Holder*, 565 U.S. ——, 132 S.Ct. 476, 181 L.Ed.2d 449 (2011).

One wonders, incidentally, if the specter of deportation would look quite so grim if we pictured the place of repatriation as Geneva or Oslo or Vancouver.

The Supreme Court's final observation that the "collateral versus direct distinction" is "ill-suited to evaluating a *Strickland* claim" does not tell us whether it is similarly ill-suited to evaluating other types of claims. The case before us, for instance, is not a *Strickland* claim. Is the ill-suitedness, perhaps, based on the fact that evaluating a *Strickland* claim involves the assessment of a lawyer's professional performance rather than the direct and necessary accrual of a consequence by a defendant? The *Strickland* performance prong *per se* does not, after all, deal with a consequence, direct or collateral. In that sense, the distinction might be deemed ill-suited.

Notwithstanding the murkiness of this Supreme Court observation, we can well imagine what a creative lawyer might attempt to do with it. Judge Lamasney, in evaluating a claim that a guilty plea was involuntary, relied upon a distinction that the Supreme Court now calls "ill-suited" to evaluating a Sixth Amendment right to effective assistance of counsel claim. It is easy to imagine an argument that although Judge Lamasney may have been arguably right on the merits, her analysis was flawed because she relied on a distinction the Supreme Court has labeled as "ill-suited." Should the decision, therefore, be sent back for a reconsideration of voluntariness on the merits without reliance on the "direct consequence/collateral consequence" distinction?

For such a far-fetched argument to prevail, however, the proponent would have to convince us that the whole phenomenon of retroactive application could apply not simply to Supreme Court holdings on constitutional issues but also to every constituent observation or jot and tittle of analysis appearing in the course of the opinion announcing the constitutional holding. Such, of course, is not the case. It is not even the case that the Supreme Court's rejection of the "direct consequence versus collateral consequence" distinction was in that case necessary to reaching its result in *Padilla*. The *Padilla* holding would have logically followed from its assessment of emerging bar association standards of professionalism in any event and was not dependent on its observation about

the "ill-suited distinction" that had been relied on by other courts. That passage in the opinion was not indispensable to the holding and does not, therefore, get to piggy-back on it into the realm of retroactive application.

If, however, purely *arguendo*, that passing comment about the ill-suitedness of the direct/collateral distinction were capable of enjoying a retroactive life of its own, was it "new law" or was it an established precedent when Miller's conviction became final? In dealing with that hypothetical argument, the dispositive question for us would, therefore, become whether that particular statement from the *Padilla* opinion of March 31, 2010, could have retroactive applicability to the appellant's conviction that became final on September 1, 1999. In other words, would the conclusion that the distinction was "ill-suited" have been dictated or compelled by the existing case law thirteen years ago?

### Performance and Reviewability Are Separate Issues

In focusing attention for the moment on the distinction between direct and collateral consequences, we unexpectedly became conscious of a vitally important distinction that had heretofore slipped completely under the radar, both ours and that of the parties. Are we ultimately assessing the performance of defense counsel under *Strickland v. Washington's* first prong or is that simply a threshold issue of a deeper inquiry? Is it possible that the ultimate decision of the hearing judge to deny relief on collateral review may have been impervious to whether the assistance of counsel had been effective or ineffective?

■ Lawyerly performance and judicial reviewability are separate issues, and the proponents of retroactivity must prevail on not one of them, but both. Just as the appeal process itself is not constitutionally mandated, neither is collateral review—post conviction, habeas corpus, coram nobis. Certain issues are legally cognizable and others are not. Simply because the Supreme Court in 2010 deems the distinction between direct and collateral consequences "ill-suited" to

resolve a question about deportation advice does not mean that hundreds, nay thousands, of earlier judicial decisions that did rely on such a distinction are now retroactively invalidated. That distinction held that constitutional shortcomings with respect to collateral consequences, even when those shortcomings are indisputably demonstrated, were not legally cognizable on the collateral review of a criminal conviction.

Retroactivity law does not presume to wield the Orwellian power to erase or to rewrite history. Nor does a *Strickland* performance prong violation *ipso facto* rewrite the prevailing rules about what issues the courts deem to be legally cognizable. The bar on the legal cognizability of issues affecting collateral consequences did not depend upon an assumption that the assistance of counsel had necessarily been effective, and a retroactive change in our assessment of lawyerly effectiveness does not affect the procedural rules about what issues were and were not reviewable.

To handle the finely layered distinctions between retroactively revising lawyerly performance, on the one hand, and retroactively revisiting legal cognizability, on the other hand, demands a surgically delicate touch. The emerging professional standards that may control our assessment of an earlier legal performance do not in any way control earlier judicial standards as to reviewability. The historic fact of a constitutional flaw and the legal cognizability of that flaw are two very different issues. Even if we now know that the lawyer was ineffective back then, the hearing judge may still have been right back then. That, moreover, is the only issue ultimately before us.

### The Focus Remains On September 1, 1999

Even if, *arguendo*, the subject matter in Miller's case were covered by *Padilla* (It is not) and even if, *arguendo*, *Padilla* were "not new law" in 2010, there would remain the dispositive question of whether the possibly retroactive *Padilla* decision was actually retroactive to the date on which Miller's criminal conviction became final. That date was September 1, 1999. *Teague v. Lane* and all eight of the Supreme Court

decisions to apply it have told us in absolute, unvarying, and explicit terms that the test for whether *Padilla* would be retroactive in the *Miller* case is whether a *Padilla*-type analysis would have been "dictated" or "compelled" by the "precedent existing" on September 1, 1999.

### Supreme Court Precedent As Of September 1, 1999

The analytic observation the *Padilla v. Kentucky* opinion made on March 31, 2010 that Miller would now like to enjoy retroactive application was this:

> The collateral versus direct distinction is thus ill-suited to evaluating a *Strickland* claim concerning the specific risk of deportation.

559 U.S. at ——, 130 S.Ct. at 1482, 176 L.Ed.2d. at 294.

Quite aside from the question of whether that statement would apply to any claims other than "a *Strickland* claim," the pertinent *Teague v. Lane* question would be whether there was anything in prior Supreme Court case law itself to indicate that such a rejection of the "direct versus collateral" distinction would have been dictated or compelled as of September 1, 1999, when Miller's conviction became final. As the *Padilla* opinion itself acknowledges, there is not. The Supreme Court had never in the past even considered the distinction as being proper or improper, well-suited or ill-suited, and said that it was not actually considering its appropriateness even in *Padilla:*

> *We,* however, *have never applied a distinction between direct and collateral consequences* to define the scope of constitutionally "reasonable professional assistance" required under *Strickland ... Whether that distinction is appropriate is a question we need not consider in this case* because of the unique nature of deportation.

559 U.S. at ——, 130 S.Ct. at 1481, 176 L.Ed.2d at 293 (emphasis supplied).

In making a case for its decision in *Padilla v. Kentucky,* the Supreme Court, 559 U.S. at ——, 130 S.Ct. at 1482, 176 L.Ed.2d at 294, cited its earlier opinion in *Immigration and Naturalization Service v. St. Cyr,* 533 U.S. 289, 121 S.Ct.

2271, 150 L.Ed.2d 347 (2001), as one that at least discussed the connection between deportation and a criminal conviction. For present purposes, however, the dispositive reality is that the *St. Cyr* case was not decided until June 25, 2001, two years after Miller's conviction had already become final. As something that did not yet even exist, the *St. Cyr* decision obviously could not have dictated or compelled any conclusion on September 1, 1999. The "then existing precedent" from the Supreme Court, therefore, was on this issue, nothing.

### The Circuit Courts of Appeals As Of September 1, 1999

In assessing claims about the voluntariness of guilty pleas in light of non-advice about deportation, the universal position on collateral review generally—habeas corpus, post-conviction, and coram nobis—was, prior to March 31, 2010, that deportation was a collateral consequence and that non-advice about a collateral consequence was not cognizable on collateral review. As of September 1, 1999, nine of the United States Circuit Courts of Appeals had spoken on this issue. Their conclusion was unanimous.

In *Caspari v. Bohlen*, 510 U.S. at 393–94, 114 S.Ct. 948 the Supreme Court made clear that a big factor in deciding whether a rule can be deemed to have been dictated or compelled by existing precedent as of a certain time is the case law from the federal courts and the state courts as of that time.

*This analysis is confirmed by the experience of the lower courts. Prior to the time respondent's conviction and sentence became final, one Federal Court of Appeals and two state courts of last resort had held* that the Double Jeopardy Clause did not bar the introduction of evidence of prior convictions at resentencing in non-capital cases.

(Emphasis supplied). These are, after all, the existing precedents that either compel the new rule in question or indicate that the new rule was not compelled.

### 1975, Second Circuit

In *United States v. Santelises*, 509 F.2d 703, 704 (2d Cir. 1975), the Second Circuit held that the mere failure of an

attorney to advise a client about deportation does not even state a claim.

All that is new is an appended affidavit from Robert Mitchell—his counsel at the plea proceedings—which states that Mitchell did not inform Santelises that he might be subject to deportation. This affidavit, however, is of no legal significance. *Since Mitchell does not aver that he made an affirmative misrepresentation, Santelises fails to state a claim for ineffective assistance of counsel.*

(Emphasis supplied).

### 1976, Ninth Circuit

In *Fruchtman v. Kenton,* 531 F.2d 946, 949 (9th Cir.1976), the Ninth Circuit held that the failure of a defendant to be advised that his criminal conviction could lead to deportation did not render his guilty plea involuntary.

*The distinction between direct and collateral consequences in familiar to us.* ... Nevertheless, the precise issue tendered here, whether the deportation constitutes a direct or collateral consequence, is one of first impression in our court. However, other Courts of Appeals have resolved the specific issue. The Second Circuit, for example, has recently reaffirmed ... *that a defendant need not be advised of deportation as a consequence of a guilty plea.*

. . . .

We agree with the Second Circuit that when, as in the case of deportation, the consequence in issue "was not the sentence of the court which accepted the plea but of another agency over which the trial judge has no control and for which he has no responsibility" *Rule 11 imposes no duty on the District Court to advise a defendant of such consequence.*

(Emphasis supplied).

### 1985, Eleventh Circuit

In *United States v. Campbell,* 778 F.2d 764, 768 (11th Cir.1985), the Eleventh Circuit was equally emphatic:

Campbell alleges that she would not have pleaded guilty if her trial counsel had advised her of the deportation consequences of the plea. This bare allegation is not sufficient, however, to establish prejudice under *Strickland.*

. . . .

... [A] defendant's lack of knowledge of those collateral consequences cannot affect the voluntariness of the plea. Accordingly, *counsel's failure to advise the defendant of the collateral consequences of a guilty plea cannot rise to the level of constitutionally ineffective assistance.*

(Emphasis supplied).

### 1988, Fourth Circuit

The Fourth Circuit in *United States v. Yearwood,* 863 F.2d 6, 7–8 (4th Cir.1988), agreed with the other circuits.

Turning to the issue raised in defendant's § 2255 motion, *we agree with the circuits which have decided the issue and found that an attorney's failure to advise a client that deportation may result from a conviction does not constitute ineffective assistance of counsel.* ...

Defendant's trial counsel had no spontaneous duty to inform defendant that his guilty plea would lead to his being deported.

(Emphasis supplied). Let it be noted that this is a post-conviction case rather than a habeas corpus case.

### 1988, First Circuit

In *United States v. Quin,* 836 F.2d 654, 655 (1st Cir.1988), the First Circuit held that deportation is only a collateral consequence of a criminal conviction and that the failure to advise a defendant of a collateral consequence is not a legally sufficient ground to attack the voluntariness of a guilty plea.

### 1989, Seventh Circuit

In *Santos v. Kolb,* 880 F.2d 941, 944 (7th Cir.1989), the Seventh Circuit added its voice to the unanimous verdict of the federal circuit courts.

In a recent and similar case, we held that *it was not ineffective assistance of counsel for an attorney to fail to inform his client of the immigration consequences of a conviction* for a drug offense. In *United States v. George*, 869 F.2d 333 (7th Cir.1989), we stated:

> *A deportation proceeding is a civil proceeding which may result from a criminal prosecution, but is not a part of or enmeshed in the criminal proceeding. It is collateral to the criminal prosecution.* While the Sixth Amendment assures an accused of *effective assistance of counsel* in *"criminal prosecutions," this assurance does not extend to collateral aspects of the prosecution.*

(Emphasis supplied).

## 1990, District of Columbia Circuit

*United States v. Del Rosario*, 902 F.2d 55, 59 (D.C.Cir. 1990), added the District of Columbia Circuit to the growing list of federal circuits taking a position diametrically opposed to the position taken by the Supreme Court in *Padilla v. Kentucky.*

> *[W]e adopt as the proper rule the view endorsed by several of our sister circuits that "counsel's failure to advise the defendant of the collateral consequences of a guilty plea cannot rise to the level of constitutionally ineffective assistance."*

> [T]rial counsel's *failure to advise a defendant of the collateral consequence of a plea of guilty affecting the possibility of the deportation of the defendant, does not fall short of the* "objective *standard of reasonableness," testing the adequacy of counsel's representation *under Strickland.*

(Emphasis supplied).

## 1992, Tenth Circuit

*Varela v. Kaiser*, 976 F.2d 1357, 1358 (10th Cir.1992), held that the Sixth Amendment's guarantee of the effective assistance of counsel does not include advice as to the collateral consequences of a guilty plea.

"While the Sixth Amendment assures an accused of effective assistance of counsel in 'criminal prosecutions,' this assurance does not extend to collateral aspects of the prosecution." . . .

*The circuits that have addressed the issue* of failure of counsel to inform an accused of the likely deportation consequences arising out of a guilty plea *have all held that deportation is a collateral consequence* of the criminal proceeding *and therefore the failure to advise does not amount to ineffective assistance of counsel.*

(Emphasis supplied).

### 1993, Fifth Circuit

*United States v. Banda,* 1 F.3d 354, 356 (5th Cir.1993), stressed the unanimity of the federal circuits on the issue.

*The courts that have addressed the question* of counsel's failure to warn of possible deportation *have uniformly held that deportation is a collateral consequence* of the criminal process *and hence the failure to advise does not amount to ineffective assistance of counsel. We are not aware of any court that has held to the contrary.* Indeed, this conclusion squares with the Supreme Court's observation that the accused must be "fully aware of the direct consequences" of a guilty plea. *Brady v. United States* (1970). *We find this position persuasive and adopt it as our own.*

(Emphasis supplied).

As of September 1, 1999, there was not a single intimation, let alone a decision, from a single Circuit Court of Appeals to the effect that the distinction between a direct consequence and a collateral consequence was "ill-suited" to resolving a claim on collateral review involving non-advice about deportation. Indeed, nine out of nine circuits implicitly held that the distinction was, indeed, well-suited to the purpose, because they relied on the distinction. The existing precedent dictating or compelling a contrary result was absolutely zero. This 9–0 disparity cannot be ignored. As Judge Adkins noted in her *Denisyuk* dissent, 422 Md. at 496, 30 A.3d 914 "Because

*Padilla* overturned such a strong and widely followed precedent, the best position is that it created a new rule."

Indeed, even if we were focused on Judge Lamasney as she denied the Coram Nobis petition on October 5, 2009, there was no existing precedent even on that later date dictating or compelling that she do something other than what she did. She heeded the unanimous voice of federal precedent and the unanimous voice of Maryland precedent. That cannot be error.

### Out-of-State Precedent As Of September 1, 1999

With respect to state court decisions voicing an opinion on whether the direct consequence/collateral consequence distinction was well-suited or ill-suited for resolving guilty plea cases on collateral review, we rely on Chin & Holmes, "Effective Assistance of Counsel and the Consequences of Guilty Pleas," 87 *Cornell L.Rev.* 697, 699 (2002):

> [E]leven federal circuits, *more than thirty states,* and the District of Columbia *have held that lawyers need not explain collateral consequences,* which, although they might follow by operation of law, are not part of the penalty imposed by the particular statute the defendant is accused of violating. *Apparently no court rejects the rule.*

(Emphasis supplied).

That law review article, to be sure, was written in March of 2002, two and one-half years after Miller's conviction became final and some of the precedents it tallies may not, therefore, have existed as of September 1, 1999. As we survey the multitudinous footnotes, however, it appears that 27 of those 30 states [6] were, indeed, on board with their reliance on the distinction as of 1999: Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina,

---

**6.** Since Maryland cannot count, of course, as one of the "other" states, that tally would be 26 out of 29 rather than 27 out of 30.

North Dakota, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Washington, Wisconsin. As Judge Adkins noted in her *Denisyuk* dissent, "the rule overturned in *Padilla* was widely accepted and well reasoned." With particular reference to the unanimous judgment of the state courts, Judge Adkins further noted in her *Denisyuk* dissent:

> [A]s the Supreme Court observed in *Butler v. McKellar,* "[T]he 'new rule' principle therefore validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decision." I find this consideration persuasive. *To avoid implying that practically all judges and practitioners have been unreasonable in their interpretation of Strickland, courts should recognize that Padilla created a new rule.*

422 Md. at 496–97, 30 A.3d 914 (emphasis supplied).

Of particular pertinence to the issue before us is that not a single state held otherwise. There was, therefore, no precedent from any state dictating or compelling a result other than that reached in this case. A contrary result cannot have been dictated or compelled by nothing. Neither was there any state court decision rejecting as "ill-suited" the distinction between direct and collateral consequences. *Padilla's* latter-day observation in that regard was certainly not dictated or compelled by the precedent existing on September 1, 1999.

### Maryland Precedent As Of September 1, 1999

Just as did the federal circuit courts of appeals and just as did the courts of our sister states, Maryland consistently held that deportation is a collateral consequence of a conviction and that the failure to have been advised as to a collateral consequence (including deportation) does not render the guilty plea involuntary. The Maryland Bible on the critical distinction between a direct consequence of a conviction and a collateral consequence has been the opinion of Judge Raker for the Court of Appeals in *Yoswick v. State,* 347 Md. 228, 700 A.2d 251 (1997). Judge Raker pointed out, *id.* at 240, 700 A.2d 251:

> The imposition of a sentence may have a number of collateral consequences and *a plea of guilty is not rendered involuntary in the constitutional sense if the defendant is not informed of the collateral consequences.* Due Process does not require that a defendant be advised of the indirect or collateral consequences of a guilty plea, even if the consequences are foreseeable. Accordingly, under Maryland Rule 4-242, *the consequences of the plea include only direct consequences, not collateral or indirect consequences.*

(Emphasis supplied). *See also Moore v. State,* 72 Md.App. 524, 525, 531 A.2d 1026 (1987); *Denisyuk v. State,* 422 Md. at 496 n. 4, 30 A.3d 914 (dissenting opinion by Adkins, J.) ("Of course, this was the rule in Maryland as well.").

In *Daley v. State,* 61 Md.App. 486, 489–90, 487 A.2d 320 (1985), this Court had earlier held:

> Applying the *Cuthrell* [*v. Director, Patuxent Institution,* 475 F.2d 1364 (4th Cir.1973) ] criteria to the present case, it is abundantly clear that *Petitioner's possible deportation is merely collateral to his guilty plea.* First, the consequence of *deportation arises from a separate civil proceeding.* Whereas Petitioner's guilty plea was entered in state criminal court, deportation is adjudicated in federal civil court.

(Emphasis supplied).

Two other Maryland cases were decided post-1999 but are referred to here simply because they confirm the continuing vitality of *Yoswick v. State.* In *Holmes v. State,* 401 Md. 429, 473–74, 932 A.2d 698 (2007), the Court of Appeals not only reaffirmed *Yoswick's* distinction between direct and collateral consequences but further pointed out that Rule 4-242(e) expressly provides that, notwithstanding the directive to advise with respect to certain collateral consequences, the "omission of advice concerning [those] collateral consequences" does not "mandate that the plea be declared invalid."

> [W]hile Maryland Rule 4-242, in 1992 and now, requires the judge to inform the defendant of the direct consequences of the plea, *Yoswick v. State* (1997), *the failure to advise of collateral consequences then and now have not been the*

*basis to vacate a guilty plea;* now it is explicated in the Rule, which provides: *"[O]mission of advice concerning the collateral consequences of a plea does not itself mandate that the plea be declared invalid."*

(Emphasis supplied).

In *Rivera v. State,* 180 Md.App. 693, 721, 952 A.2d 396 (2008), *aff'd,* 409 Md. 176, 973 A.2d 218 (2009), Judge Rodowsky wrote for this Court:

> Possible deportation is not one of "the [direct] consequences of the plea," *see Yoswick v. State,* 347 Md. 228, 238–41, 700 A.2d 251, 256–57 (1997), about which the court is directed, by Rule 4–242(c), to inquire when a guilty plea is tendered. *See Daley v. State,* 61 Md.App. 486, 487 A.2d 320 (1985).

*Whorton v. Bockting,* 549 U.S. at 417, 127 S.Ct. 1173 stressed the point that "reasonable good-faith" interpretations of existing precedent are entitled to Supreme Court validation:

> The "new rule" principle ... validates *reasonable, good-faith interpretations* of existing precedents made *by state courts even though they are shown to be contrary to later decisions.*

(Emphasis supplied).

The Maryland law as of September 1, 1999 did not dictate or compel a *Padilla*-type rule. It actually would have compelled an opposite result. The Maryland cases, moreover, actually relied on the distinction between direct and collateral consequences rather than rejected it. When we look back now on the use of such a distinction then, it should be carefully noted that we are not appraising the distinction's merit. We are simply taking historical note of it as existing precedent. Our present disapproval of a precedent does not wipe it off the historic ledger as a then-existing precedent.

### What Does the Supreme Court Think About Its Own Opinion?

Within the last 22 years, a series of Supreme Court opinions have added an interesting new wrinkle to "new versus old law"

analysis. The ultimate focus, of course, remains on the time when the defendant's conviction became final. As evidence sometimes bearing on that question, however, the Supreme Court has now countenanced looking at the Court that issued the new constitutional decision to see what that Court, at the time of issue, thought about the newness of its product.

What the Supreme Court thinks about the vintage of its new decision is not, of course, the ultimate test. That ultimate test must still be administered as of the time the petitioner's criminal conviction became final. What the Supreme Court, issuing a new decision, thinks about the newness or oldness of the decision, however, may have some evidentiary bearing on the earlier decision at the earlier time.

If the Supreme Court is essentially agreed that its decision is, indeed, new law, then the question of applying it retroactively to cases on collateral review does not arise. It is only when some members of the Court think that their new decision is based on established precedent and is not new law that the retroactivity focus reverts to the time when a particular criminal conviction became final. On that ultimate decision, however, what the Supreme Court now thinks about newness or oldness will have some evidentiary bearing on what may have been dictated by existing precedent back then. The logic is that if the present Supreme Court cannot agree that it is only applying a well-established principle even now, how can the principle be deemed to have been a well-established or compelling principle back then.

## A. Disagreement Among the Justices

 An analysis of the prospective versus the retrospective may thus entail a look into the introspective. In taking a look into the minds of the justices, this evidentiary technique looks at the entire Court, not just at the majority opinion. In deciding whether the new legal principle is still an open question as to which "reasonable jurists" could disagree, the psychoanalytic technique looks at all nine justices, not just at five of them. Attention must be paid to majority, plurality, concurring, and dissenting opinions alike.

On our present visit to the examining room, the subject on the couch will be *Padilla v. Kentucky* itself. One of its most prominent features, which it would be foolhardy to ignore, is that it was a 5–4 split decision.[7] Not strangely, such institutional schizophrenia may have a decided influence on retroactivity, as was well explained by *Beard v. Banks*, 542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004). The issue was whether Banks's conviction, which had become final in 1987, would be influenced retroactively by the Supreme Court decisions in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), which had been filed on June 6, 1988, and *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), which was filed on March 5, 1990. If, as the petitions contended, *Mills* and *McKoy* had been themselves compelled by earlier Supreme Court decisions, then Banks's desired result might have been similarly dictated by those earlier compelling precedents. The Supreme Court framed the issue:

> The court recognized that its primary task was to determine *whether Mills announced a new rule,* and that this, in turn, required it to ascertain *whether the precedent existing at the time respondent's conviction became final dictated or compelled the rule in Mills.*

542 U.S. at 409, 124 S.Ct. 2504 (emphasis supplied). The Supreme Court was clear, *id.* at 410, 124 S.Ct. 2504 that it had been deliberate in its choice of the verb "compel."

> Although the *Lockett* [*v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ]/*Eddings* [*v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ] line of cases supports the Court's decision in *Mills, it does not compel that decision. Mills* therefore announced a new rule.

(Emphasis supplied).

The Supreme Court held that the *Mills* and *McKoy* decisions had not been compelled by earlier cases because "rea-

---

**7.** Indeed, the failure to look at so prominent a symptom might label the analyst as "ineffective" pursuant to the performance prong of Elementary Psychology 101.

sonable jurists" could have differed with respect to the compelling force of the earlier cases. The *Beard v. Banks* opinion, 542 U.S. at 414–15, 124 S.Ct. 2504 pointed out that "reasonable jurists" had so differed, as evidenced by four dissenting justices in *Mills* and three dissenting justices in *McKoy.*

We think it clear that reasonable jurists could have differed as to whether the *Lockett* principle compelled *Mills.*

But *there is no need to guess. In Mills, four Justices dissented,* reasoning that because nothing prevented the jurors from hearing any mitigating evidence that the defendant proffered, the *Lockett* principle did not control. *In McKoy, three Justices dissented,* explaining that " 'the principle established in Lockett' does not remotely support" the new focus on individual jurors.

(Emphasis supplied). Because *Mills* and *McKoy* had not been compelled, a similar result in 1987, when Banks's conviction became final, would not have been compelled.

Justice Kennedy wrote for the Supreme Court in *Sawyer v. Smith,* 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990), that its earlier decision in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), had not been compelled and was, therefore, new law that would not apply retroactively to Sawyer's conviction which had become final on April 2, 1984. With respect to *Caldwell,* the Court noted:

Certainly, *Caldwell was not seen as compelled by the three Justices* of this Court *who found a "lack of authority "* in our Eighth Amendment precedents *for the approach taken there.*

497 U.S. at 236–37, 110 S.Ct. 2822 (emphasis supplied).

In *O'Dell v. Netherland,* 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997), the Supreme Court concluded that *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133, decided on June 17, 1994, was new law when it was decided and would not, therefore, be applied retroactively to O'Dell's convictions which had become final on October 3, 1988. Initially, Justice Thomas's opinion was very helpful in making clear the allocation of the burden of proof when it

comes to the possible retroactive application of a new Supreme Court decision.

> *Before a state prisoner may upset his state conviction* or sentence on federal collateral review, *he must demonstrate* as a threshold matter *that the court-made rule of which he seeks the benefit is not "new."*

521 U.S. at 156, 117 S.Ct. 1969 (emphasis supplied). After looking at a plurality opinion in *Simmons* by four justices, a concurring opinion by three justices, and a dissenting opinion by two justices, the Court, 521 U.S. at 159–60, 117 S.Ct. 1969 noted:

> The array of views expressed in *Simmons* itself suggests that *the rule announced there was,* in light of this Court's precedent, *"susceptible to debate among reasonable minds."*

(Emphasis supplied). Accordingly, the *Simmons* opinion was new law and would not be applied retroactively. *See also Butler v. McKellar,* 494 U.S. 407, 412–15, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990).

In her dissenting opinion in *Denisyuk,* 422 Md. at 494, 30 A.3d 914 Judge Adkins similarly recognized that disagreement among judges as to the state of the law is a sure-fire indication that the new rule being examined was not dictated or compelled by existing precedent:

> In *Beard v. Banks,* the Court refined the *Teague* standard, holding that *a rule is new whenever "reasonable jurists could differ as to whether precedent compels [it]."* Thus, the Tenth Circuit recently held that *Padilla* created a new rule because "a reasonable jurist . . . would not have considered Supreme Court precedent to compel [its result]." *U.S. v. Chang Hong* [671 F.3d 1147, 1155] (10th Cir.2011). The Seventh Circuit reached the same result, holding that *Padilla created a new rule because one could not say that prior cases holding differently had been "unreasonable in their reading of existing Supreme Court precedent." Chaidez v. U.S.,* 655 F.3d 684 (7th Cir.2011).

(Emphasis supplied).

As we turn the glare of introspection, therefore, on *Padilla v. Kentucky,* we perceive a badly fragmented opinion. The

dissent of Justice Scalia, joined by Justice Thomas, notes that "[t]here is no basis in text or principle to extend the constitutionally required advice regarding guilty pleas beyond those matters germane to the criminal prosecution at hand." 559 U.S. at ——, 130 S.Ct. at 1495, 176 L.Ed.2d at 308–09. There was no suggestion that the time-honored distinction between direct consequences and collateral consequences was no longer a valid one or that it had become "ill-suited" to a case involving possible deportation.

The most revealing insight into whether "reasonable jurists" differed about whether the result—including the observation that the "direct consequence/collateral consequence" distinction was "ill-suited" to a case involving deportation—was compellingly correct is the concurring opinion of Justice Alito, joined by Chief Justice Roberts. Justice Alito repeatedly referred to the majority opinion as one that was breaking new ground.

> The Court tries to justify *its dramatic departure from precedent* by pointing to the views of various professional organizations. . . . And we must recognize that *such standards may represent only* the *aspirations* of a bar group *rather than* an empirical assessment of *actual practice.*

559 U.S. at ——, 130 S.Ct. at 1488, 176 L.Ed.2d at 300–01 (emphasis supplied).

His concurrence emphasized the "longstanding and unanimous position of the federal courts" that was diametrically opposed to the new approach being taken by the *Padilla* majority:

> *Until today, the longstanding and unanimous position of the federal courts was* that reasonable defense counsel need only advise a client about the direct consequences of a criminal conviction.

559 U.S. at ——, 130 S.Ct. at 1487, 176 L.Ed.2d at 300 (emphasis supplied). Justice Alito again made reference to the newness of the *Padilla* holding: *"The Court's new approach* is particularly problematic. . . ." 559 U.S. at ——, 130 S.Ct. at 1488, 176 L.Ed.2d at 301 (emphasis supplied).

In pointing out that the new position being taken by the majority was not simply out of line with the universally followed precedent but was squarely athwart the well-worn and familiar path, Justice Alito characterized the new approach as "a major upheaval" and "a dramatic expansion." He made challenging reference to the departure from pre-existing law, as he pointed out that the majority's new approach "has been rejected by every Federal Court of Appeals to have considered the issue" and that the majority's holding "casually dismisses the longstanding and unanimous position of the lower federal courts."

> Fourth, *the Court's decision marks a major upheaval in Sixth Amendment law.* This Court decided *Strickland* in 1984, but *the majority does not cite a single case, from this or any other federal court, holding that criminal defense counsel's failure to provide advice concerning the removal consequences of a criminal conviction violates a defendant's Sixth Amendment right to counsel.* As noted above, *the Court's view has been rejected by every Federal Court of Appeals to have considered the issue* thus far. The majority appropriately acknowledges that the lower courts are "now quite experienced with applying *Strickland,*" but *it casually dismisses the longstanding and unanimous position of the lower federal courts* with respect to the scope of criminal defense counsel's duty to advise on collateral consequences.

559 U.S. at ——, 130 S.Ct. at 1491–92, 176 L.Ed.2d at 304–05 (emphasis supplied). The majority opinion simply treated the then-prevailing law as if it were non-existent. It made no mention of it. In no respect did the majority opinion take issue with these characterizations of its holding as a major shift in direction.

## B. What the Majority Thought About Itself

Even the majority opinion itself in *Padilla* acknowledged that it was doing something new. At the very outset of the opinion, the Court observed, 559 U.S. at ——, 130 S.Ct. at

1478, 176 L.Ed.2d at 290, that it was responding to a dramatically changing situation:

> *The landscape* of federal immigration law *has changed dramatically* over the last 90 years.

(Emphasis supplied).

The opinion then proceeded to chronicle significant changes in immigration law and policy that had occurred in 1917, 1922, 1952, and 1996 and from those changes concluded:

> *These changes* to our immigration law *have dramatically raised the stakes* of a non-citizen's criminal conviction.

559 U.S. at ——, 130 S.Ct. at 1480, 176 L.Ed.2d at 292 (emphasis supplied). The implication was unmistakable that the law providing some relief to non-citizens, far from remaining static, would have to change to meet the changing needs of changing times, to wit, the "dramatic rais[ing of] the stakes."

The Solicitor General, as amicus curiae, had urged that notice be taken only of affirmative misadvice about deportation and not of non-advice. The Supreme Court declined to buy that argument, but did acknowledge, 559 U.S. at ——, 130 S.Ct. at 1484, 176 L.Ed.2d at 296, that the Solicitor General's position "has support among the lower courts," citing four federal circuits and two state courts. *United States v. Couto*, 311 F.3d 179, 188 (2d Cir.2002); *United States v. Kwan*, 407 F.3d 1005 (9th Cir.2005); *Sparks v. Sowders*, 852 F.2d 882 (6th Cir.1988); *United States v. Russell*, 686 F.2d 35 (D.C.Cir. 1982); *State v. Rojas–Martinez*, 125 P.3d 930, 935 (Utah 2005); *In re Resendiz*, 25 Cal.4th 230, 105 Cal.Rptr.2d 431, 19 P.3d 1171 (2001). No case was cited opposing that view. The Supreme Court may have been correct in what it did, but, for purposes of retroactivity analysis, it was not following a well-trodden path.

Although the Supreme Court cautioned that "we must be especially careful about recognizing new grounds for attacking the validity of guilty pleas," 559 U.S. at ——, 130 S.Ct. at 1485, 176 L.Ed.2d at 298, it then explained why it felt justified in doing so. The subject matter of that careful balancing,

however, was expressly that of "recognizing *new grounds* for attacking the validity of guilty pleas." (Emphasis supplied).

Another sure-fire tip-off that the *Padilla* Court was preparing to change the law was its amassing, 559 U.S. at ——, 130 S.Ct. at 1482, 176 L.Ed.2d at 294–95, of "prevailing professional norms [to] support the view that counsel must advise her client regarding the risk of deportation." The Court cited a host of professional ethical standards and academic authorities.[8] That is a classic argumentative technique when making a case not for recognizing what the law already is but in building persuasive support for what the law, in the Court's judgment, ought to be. The Supreme Court was unquestionably justifying the change it was about to make. That, by definition, is making new law. That much is clear from within the four corners of the majority opinion itself.

## C. What Must the Court Look For In Itself?

In engaging in an introspective view into the oldness or newness of its own behavior, what are the tell-tale factors that a Court should examine? Frequently even a new rule does not spring like Athena from the brow of Zeus full-born. There will almost always have been antecedent tendencies and significant hints of impending change. The Supreme Court has been absolutely clear, however, that such harbingers will not suffice to qualify a new rule as nothing more than the application of a well-settled proposition to a fresh set of facts.

In *Butler v. McKellar*, 494 U.S. 407, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990), the argument was made that *Arizona v. Roberson* (1988) was not new law and, therefore, should have been applied retroactively because it was nothing more than an application of the well-settled law of *Edwards v. Arizona* (1981) to a slightly different set of facts. *Arizona v. Roberson* was far more intimately intertwined with *Edwards v. Arizona,* than was *Padilla v. Kentucky* with *Strickland v. Washington.*

---

**8.** Most of these, we note, were not yet on the books when Miller's criminal conviction became final on September 1, 1999 and, therefore, could have had no influence on his case.

The Court resoundingly rejected such a definition of what is "not new law":

> Butler contends that *Roberson* did not establish a new rule and is, therefore, available to support his habeas petition. *Butler argues that Roberson was merely an application of Edwards to a slightly different set of facts.* In support of his position, *Butler points out that the majority had said that Roberson's case was directly controlled by Edwards.* ...
>
> But *the fact that a court says that its decision is within the "logical compass" of an earlier decision, or indeed that it is "controlled" by a prior decision, is not conclusive for purposes of deciding whether the current decision is a "new rule" under Teague.* ... In *Roberson*, for instance, the Court found *Edwards* controlling but acknowledged *a significant difference of opinion on the part of several lower courts that had considered the question previously.* That *the outcome in Roberson was susceptible to debate among reasonable minds* is evidenced further by the differing positions taken by the judges of the Courts of Appeals for the Fourth and Seventh Circuits noted previously. It would not have been an illogical or even a grudging application of *Edwards* to decide that it did not extend to the facts of *Roberson.* We hold, therefore, that *Roberson* announced a "new rule."

494 U.S. at 414–15, 110 S.Ct. 1212.

## The Academic Verdict on Old Versus New

The academic community has made precisely the same assessment as to the essential newness of the holding in *Padilla v. Kentucky.* See Stephanos Bibas, "Regulating the Plea–Bargaining Market: From Caveat Emptor to Consumer Protection," 99 *Calif. L.Rev.* 1117 (2011): *"Padilla v. Kentucky* marks a watershed," *id.* at 1118; "the Court's shift ... is nascent," *id.* at 1119; *"Padilla* is the Court's first case to treat plea bargaining as a subject worthy of constitutional regulation," *id.* at 1120; "the seven-Justice majority began to drag the law into the twenty-first century," *id.;* "This is a

welcome first step," *id.;* "the large shifts in landscape wrought by the *Padilla* tremor," *id.* at 1137; "*Padilla* . . . may have heralded the dawn of a new era," *id.* at 1139. Those are not descriptions of a not unexpected application of a well-settled principle.

McGregor Smyth, "The Seismic Evolution of *Padilla v. Kentucky* and Its Impact on Penalties Beyond Deportation," 54 *How. L.J.* 795 (2011), described with similar language the unexpected impact of *Padilla v. Kentucky:* "In a move last Term that shocked commentators and practitioners alike, the Supreme Court ignored decades of lower court case law to effectively repudiate this doctrine—which has been one of the most dominant . . . legal fictions of the criminal justice system," *id.* at 796; "The Court's recasting of Sixth Amendment jurisprudence . . . ," *id.* at 797; "Justice Stevens's analysis and rhetoric set off a seismic event. In addition to effectively repudiating decades of lower court case law, the *Padilla* decision was most striking in its shift in analytical perspective," *id.* at 798; "*Padilla* represents . . . a revolutionary shift in analysis with an impact on practice that can hardly be overstated," *id.* at 802; "The shockwave of the Court's seminal decision has only begun to hit daily practice," *id.* at 835. Those are not descriptions of the mere application of a settled principle.

Malia Brink, "A Gauntlet Thrown: The Transformative Potential of *Padilla v. Kentucky,*" 39 *Fordham Urban L.J.* 39 (2011) is briefer but just as certain that *Padilla* represented new law: "There is no doubt that *Padilla* broke new ground," *id.* at 41; "the full meaning of the Court's decision in *Padilla* is far from clear," *id.* at 42; "the magnitude of the shift that *Padilla* demands," *id.* at 52.

## Circuit Court Decisions Post–1997

Faced with the juggernaut of eleven out of eleven United States Courts of Appeals and 30 out of 30 states following a legal rule that was the diametric opposite of the rule announced in *Padilla,* the proponents of *Padilla's* retroactivity have been hard pressed to maintain that the *Padilla* rule was

dictated or compelled by existing pre-*Padilla* precedent. The 41–0 plebiscite was a daunting challenge to explain away. Ignoring the states and turning only to the federal circuits, the pro-retroactivity spinmeisters now claim that any pre–1997 United States Circuit Court decision should be discounted, because it came before the Illegal Immigration Reform and Immigration Responsibility Act (IIRAIRA) of 1996 (effective on April 1, 1997) had "dramatically raised the stakes of a noncitizen's criminal conviction." *Padilla*, 130 S.Ct. at 1480. See, for instance, *United States v. Orocio*, 645 F.3d 630, 640 (3d Cir.2011) ("Lower court decisions not in harmony with *Padilla* were, with few exceptions, decided before 1975."). With that, the proponents of retroactivity simply went on to ignore existing pre-*Padilla* precedent.

In terms of what the pre-*Padilla* law actually was, however, the resounding anti-*Padilla* consensus cannot that easily be dismissed. Between 1997 and the promulgation of *Padilla* in 2010, four United States Courts of Appeals, took up the question (the 1st, 9th and 10th Circuits by way of reconsideration and the 6th Circuit considering it for the first time). Each of those circuits took the IIRAIRA of 1996 expressly into account, acknowledging the virtually automatic deportation of convicted aliens after that date. Four circuits out of four nonetheless declined to adopt a *Padilla*-type rule. In all four opinions, there was not a single dissenting voice. *United States v. Gonzalez*, 202 F.3d 20 (1st Cir.2000); *United States v. Amador–Leal*, 276 F.3d 511 (9th Cir.2002); *El–Nobani v. United States*, 287 F.3d 417 (6th Cir.2002); *Broomes v. Ashcroft*, 358 F.3d 1251 (10th Cir.2004).

## Circuit Court Decisions Post-*Padilla*

Since *Padilla* was decided on March 31, 2010, four United States Courts of Appeals have weighed in on the specific question of whether *Padilla* 1) announced new law and was not, therefore, eligible for retroactive application; or 2) only applied settled principles and was, therefore, eligible for retroactive application. The vote was three to one against retroactivity.

*United States v. Orocio,* 645 F.3d 630 (3d Cir.2011), held in favor of retroactivity. The defendant was a coram nobis petitioner whose criminal conviction had become final in the spring of 2005. For its retroactivity analysis, *Orocio,* 645 F.3d at 639, basically relied on *Padilla's* statement that "for at least the past 15 years, professional norms have generally imposed an obligation on counsel to provide advice" on the risk of deportation.

In *United States v. Chang Hong,* 671 F.3d 1147 (2011), the United States Court of Appeals for the Tenth Circuit held just the opposite. The defendant's criminal conviction, based on a guilty plea, had become final on February 29, 2008. The Tenth Circuit made it very clear that the test was whether what later became the *Padilla* rule would have been "compelled by existing precedent" back on February 29, 2008:

> [W]e assess whether the rule in *Padilla* is actually "new," based on *whether a "court considering [Hong]'s claim at the time his conviction became final would have felt compelled by existing precedent* to conclude that the rule [announced in *Padilla* ] was required by the Constitution."

671 F.3d at 1151 (emphasis supplied).

*Chang Hong* concluded that "existing precedent" not only did not dictate or compel the *Padilla* rule but would unanimously have compelled an opposite result:

> While grounded in *Strickland,* we still conclude *Padilla is a new rule of constitutional law.* Before *Padilla,* most state and federal courts had considered the failure to advise a client of potential collateral consequences of a conviction to be outside the requirements of the Sixth Amendment. *"[E]leven federal circuits, more than thirty states, and the District of Columbia have held that lawyers need not explain collateral consequences* [under the Sixth Amendment]." *All of these courts*—including our own—*thought the rule if Padilla was not dictated or compelled by Court precedent.* It goes without saying these are some of the

"reasonable jurists" we must survey to determine if *Padilla* is a new rule.

671 F.3d at 1154 (emphasis supplied).

The most recent court to ring in on the anti-retroactivity side of the question was the Fourth Circuit in *United States v. Mathur*, 685 F.3d 396 (4th Cir.2012), with an excellent opinion by Judge Paul Niemeyer. The Fourth Circuit first held that *Padilla* announced new law and, generally speaking, would not, therefore, enjoy retroactive application. The opinion then rejected Mathur's argument that he qualified for one of the two special exceptions to non-retroactivity, those special exceptions not being pertinent to the present discussion. Mathur then argued that the *Padilla* opinion itself proclaimed its own retroactivity. In rejecting that contention, Judge Niemeyer pointed out:

> Unable to direct us to a prior case that has found that *Padilla* created a new right that is retroactively applicable to cases on collateral review, *Mathur argues that Padilla itself can be read to hold that its new right should be retroactively applied, even though it never said it was doing so, nor did it conduct any Teague analysis as would be necessary to do so.*
>
> ... *Nowhere does the opinion make a single reference to Teague and its progeny, nor to the principles annunciated in those decisions.* ... The only way to make a new rule retroactive "is through a *holding*," not through dictum.

685 F.3d at 401 (emphasis supplied).

The leading case on the non-retroactivity of *Padilla* is *Chaidez v. United States*, 655 F.3d 684 (7th Cir.2011). It is this decision of the Seventh Circuit on which the Supreme Court granted *certiorari* on April 30, 2012, and which is scheduled for argument on October 30, 2012. The district court had granted coram nobis relief, ruling that *Padilla* was not new law and would, therefore, apply retroactively to Chaidez's conviction, which had become final in April of 2004. The Seventh Circuit reversed, holding *Padilla* was new law that did not apply retroactively, acknowledging that "*Teague*

governs our analysis." 655 F.3d at 688. Judge Flaum's opinion set out the test to be applied:

> The pertinent inquiry here is whether *Padilla's* outcome was "susceptible to debate among reasonable minds." Put differently, *"our task is to determine whether a . . . court* considering [Chaidez's] claim at the time [her] conviction became final"—pre-*Padilla*—"*would have felt compelled by existing precedent to conclude that [Padilla] was required by the Constitution."*

655 F.3d at 688–89 (emphasis supplied). The criteria that bear on that question were then articulately set out.

> [T]he Court's retroactivity jurisprudence provides guidance. *In assessing whether the outcome of a case was susceptible to reasonable debate, the Court has looked to both the views expressed in the opinion itself and lower court decisions. Lack of unanimity on the Court in deciding a particular case supports the conclusion that the case announced a new rule.* These considerations convince us that *Padilla* announced a new rule.

655 F.3d at 689 (emphasis supplied). The division on the *Padilla* Court itself produced what was self-evidently new law.

> The majority opinion in *Padilla* drew *a concurrence authored by Justice Alito and joined by Chief Justice Roberts,* as well as *a dissenting opinion authored by Justice Scalia and joined by Justice Thomas. That the members of the Padilla Court expressed such an "array of views" indicates that Padilla was not dictated by precedent. . . .* Justice Alito and Chief Justice Roberts considered *Padilla* to be ground-breaking. [T]he two dissenting Justices, . . . certainly did not see *Padilla* as dictated by precedent. Even the majority suggested that the rule it announced was not *dictated* by precedent.

655 F.3d at 689 (emphasis supplied).

The Seventh Circuit rejected emphatically the notion that a legal rule is a settled principle simply because harbingers of it can be seen in earlier events. The past participles "dictated"

and "compelled" demand more than omens or intimations of things to come.

> *Padilla cannot be an old rule simply because existing case law "inform[ed], or even control[led] or govern[ed]," the analysis. Nor will the rule of Padilla be deemed old because precedent lent "general support" to the rule it established,* or because it represents "the most reasonable ... interpretation of general law." *Padilla* can only be considered an old rule if Supreme Court precedent "*compel[led]*" the result.

655 F.3d at 689–90 (emphasis supplied). Nor may the phalanx of federal court and state court decisions to the contrary be blithely ignored:

> *Such rare unanimity among the lower courts is compelling evidence that reasonable jurists* reading the Supreme Court's precedents in April 2004 *could have disagreed about the outcome of Padilla.*

655 F.3d at 690 (emphasis supplied).

The Seventh Circuit concluded its opinion with an insightful analysis of the fundamental nature of the *Teague v. Lane* test itself:

> *The Supreme Court has defined the concept of an old rule under Teague narrowly, limiting it to those holdings so compelled by precedent that any contrary conclusion must be deemed unreasonable.* While determining whether a rule is new can be challenging, and this case provides no exception, we conclude that *the narrow definition of what constitutes an old rule tips the scales in favor of finding the Padilla announced a new rule.* Moreover, that numerous courts had failed to anticipate the holding in *Padilla,* though not dispositive, is strong evidence that reasonable jurists could have debated the outcome.

655 F.3d at 694 (emphasis supplied). This, of course, will all be before the Supreme Court on October 30, 2012.

## Conclusion

With our eye resolutely on the single date of September 1, 1999, the day on which Lincoln Miller's criminal conviction became final, we hold that there was no "existing precedent" as of September 1, 1999 that would have compelled or dictated 1) a legal ruling that the failure to advise a criminal defendant about deportation consequences would constitute the ineffective assistance of counsel according to the Sixth Amendment; 2) a legal ruling that such a Sixth Amendment violation would *ipso facto* render an otherwise acceptable guilty plea involuntary even in a case where a Sixth Amendment claim had not been raised; or 3) a legal ruling that judges conducting collateral review of criminal convictions may not rely on the distinction between the direct and collateral consequences of a conviction because the Supreme Court would, eleven years later, deem the distinction "ill-suited" for that purpose. Accordingly, we affirm the decision of Judge Lamasney to deny Miller's petition for a Writ of Error Coram Nobis.

## A Secondary Contention

Miller raised an additional and secondary contention which we answered in our original opinion on December 29, 2010. The Per Curiam order of the Court of Appeals has not asked us to reconsider that part of our opinion. It remains unchanged.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**